Argued September 9, 1966, reversed and remanded April 12, 1967

# NEWTON, *Respondent, v.* BROOKS, *Appellant.*

426 P. 2d 446

*Wayne M. Thompson,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Alan D. Gross,* Salem, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman,[*] Justices.

GOODWIN, J.

The superintendent of the Oregon State Hospital appeals an order in habeas corpus discharging from his custody a person who had been committed under ORS 136.730 following acquittal of criminal charges on the ground of "insanity". The controlling statute reads as follows:

> ORS 136.730. "If the defense is the insanity of the defendant, the jury shall be instructed to state, if it finds him not guilty on that ground, that fact in the verdict, and the court shall thereupon, if it deems his being at large dangerous to the public peace or safety, order him to be committed to any hospital or institution, authorized by the state to receive and keep such persons, until he becomes sane or is otherwise discharged therefrom by authority of law."

(The only change since 1864 in the wording of the section has been the substitution by the revisers of "hospital or institution" for "lunatic asylum.")

The person whose custody is in question will be referred to as Kealey. (His mother is the nominal plaintiff in the habeas corpus proceeding.) In 1964 Kealey was arrested and charged with burglary. Shortly after his arrest, his behavior caused his jailers to question his mental condition. Pursuant to ORS

---

[*] Holman, J., did not participate in this decision.

136.150, he was taken to the state hospital for a pretrial mental examination. Kealey was found at that time to be unable to understand the charges against him or to assist in his own defense.

When it appeared to the court that Kealey was mentally unfit to stand trial, the court entertained proceedings for his commitment·to the state hospital. The examining physicians at the commitment hearing diagnosed Kealey's condition at that time as schizophrenia. "Schizophrenia" is standard medical nomenclature for certain mental disorders, but is neutral as far as criminal responsibility is concerned.[1]

Kealey remained in the state hospital for more than a year. In July 1965, the hospital staff reported that he was sufficiently oriented to understand the charges against him and to assist in his own defense. The court in due course allowed the state to resume the prosecution of the criminal indictment. With the advice of counsel, Kealey entered a plea under ORS 136.730 (not guilty by reason of insanity) and waived trial by jury.

■ The trial court found him not guilty by reason of insanity. This finding did not necessarily carry with it a determination that Kealey committed the acts charged, because ORS 136.730 is ambiguous upon this point. Some courts construe similar statutes as including such a special finding.[2] In California, the statute specifies that the state must prove and the jury must find that the defendant committed the proscribed acts before the question of criminal responsibility is

---

[1] Whether or not a particular sufferer from schizophrenia meets the right-wrong test of criminal responsibility is an open question in each criminal trial. Cf. State v. Gilmore, 242 Or 463, 410 P2d 240 (1966).

[2] See Burger, J., Ragsdale v. Overholser, 281 F2d 943, 948 (DC Cir 1960).

considered.[9] Since Kealey has not in this case challenged his commitment under ORS 136.730 on the ground that he was never found to have committed the unlawful acts, we need not now decide whether a bifurcated trial or special verdict on the California pattern must be read into our statute in order to satisfy due process in such a case.

■ The trial court decided, after finding Kealey not guilty under ORS 136.730, that he was dangerous, and committed him to the state hospital. Three months later, Kealey's mother initiated the present habeas corpus proceeding before a different court. At the habeas corpus hearing, the only witnesses were those called by Kealey. They were the superintendent of the Oregon State Hospital and Kealey's attending psychiatrist at the hospital. Their testimony, however, supported the state's contention that Kealey's release would present a danger to himself or others. They testified that on several occasions Kealey had demonstrated an inclination toward physical violence, including one occasion when he threatened others with a gun. Kealey, they also testified, was not able to cope with responsibility, and ran away from the hospital when he was given some freedom.[4] His record as a whole tended to show that he was a dangerously irresponsible individual.

One witness diagnosed Kealey as a person with a "sociopathic personality disturbance, antisocial reac-

[9] See Cal. Penal Code § 1026, which requires a prior determination of any pleas joined with the plea of not guilty by reason of "insanity". If the preliminary determination is resolved against the defendant, the same jury or a new jury, in the discretion of the trial judge, tries the "sanity" issue.

[4] Running away when an opportunity presents itself does not necessarily prove a mental abnormality. See Robertson v. Cameron, 224 F Supp 60, 63 (DDC 1963).

tion." This nomenclature is presently fashionable as a sort of psychiatric catch-all for persons who do not control their behavior even though they may have the mental capacity under most circumstances to do so. Such a defect, whether or not it is an "illness," is common among prison populations.[6] A "sociopathic personality disturbance" can in some individuals constitute a serious danger to society. The testimony below indicates that Kealey was, at least at one time, such a dangerous individual.

The habeas-corpus court, however, in the mistaken belief that dangerousness was irrelevant, announced that it made no difference how dangerous Kealey might be, so long as he was "sane".

■ The court's difficulty was caused in part by a language barrier that plagues medical and legal investigations in the realm of criminal responsibility and mental health. The doctors testified that while Kealey was not "grossly psychotic" he was dangerous. The habeas-corpus court took this to mean that he was "sane". The term, "until he becomes sane," in ORS 136.730 is meaningless unless it is related to the reason for commitment, which is dangerousness.

■■ Commitment under ORS 136.730 is intended to protect the public from the premature release of a dangerous offender who has been acquitted of criminal liability under the *M'Naghten* test.[7] If a mental disorder makes the person's freedom a hazard to society,

---

[6] However, one mental hospital official says that sociopaths are increasingly being diagnosed "schizophrenic" by psychiatrists for purposes of criminal responsibility and then being committed to mental institutions. Baur, *Legal Responsibility and Mental Illness,* 57 Nw U L Rev 12, 16 (1962).

[7] See State v. Gilmore, supra note 1, reaffirming the *M'Naghten* rule for criminal liability.

public safety may require his detention.[7] This is a reasonable legislative objective.

So long as a person's mental disorder continues, whatever form the disorder may take, or whatever name the doctors may give it, if it is probable that the disorder would make the person's liberty dangerous to the public, the legislative policy within constitutional bounds ought to be carried out. The problem is to formulate guidelines which will effectuate the legislative policy and at the same time protect constitutional rights to liberty.[8] The Oregon statute can be construed to make dangerousness resulting from mental disorder a relevant constitutional standard for continued custody. Such a rule has support elsewhere. See, e.g., *State ex rel. Barnes v. Behan,* 80 SD 370, 124 NW2d 179 (1963). So long as judicial review is available, restraint in such cases is generally upheld as constitutional. See cases collected in Annotation, 95 ALR2d 54 (1964).

The Model Penal Code makes dangerousness the sole criterion[9] for continued custody in a mental institution following mandatory commitment. Model Penal Code § 4.08 (1962). The reasons given in the comment to the tentative draft (No. 4, 1955) are as follows:

---

[7] See concurring opinion of Burger, J., in Blocker v. United States, 288 F2d 853, 857 (DC Cir 1961).

[8] For an excellent analysis of this problem, see Goldstein and Katz, *Dangerousness and Mental Illness, Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity,* 70 Yale L J 225, 237-239 (1960), and Krash, *The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia,* 70 Yale L J 905, 943-946 (1961).

[9] But see Starr v. United States, 264 F2d 377, 383 (DC Cir 1958), cert. denied 359 US 936, 79 S Ct 652, 3 L Ed2d 639 (1959), where it was held that a person's dangerous propensities must be attributable to an abnormal mental condition in a case arising under a statute similar to Oregon's.

(1) Although his mental disease may have improved greatly, a person acquitted by reason of insanity may still be dangerous because of factors in his personality and background other than mental disease.

(2) Such a standard provides a possible means for the control of the occasional defendant who may be quite dangerous to society but who has successfully feigned mental disease to gain acquittal.

■ The ideal test would be an accurate prediction of a committed person's ability to control his future behavior. Obviously, the art of testing and predicting behavioral control has not reached this degree of sophistication. Our task is to formulate a test that will carry out the intent of ORS 136.730. That statute places the focus of the inquiry upon the element of danger to the public.

■ While ORS 136.410 now prescribes the *M'Naghten* standard for criminal responsibility, ORS 136.730 prescribes a "dangerous" standard for the commitment of those acquitted under the *M'Naghten* rule. It is only reasonable to assume that the legislature intended to have courts apply the same "dangerous" standard for release. We hold, therefore, that "until he becomes sane," for the purposes of release, means "until he becomes sufficiently able to control his behavior so that he is no longer dangerous."

■ Because habeas-corpus proceedings under ORS 34.310 are brought in Marion County, where the state hospital is located, the judge trying the question of release will only rarely be the same judge who committed the person as dangerous under ORS 136.730. To minimize horizontal appeals from one circuit judge to another after a finding that a person is dangerous,

the judge considering a petition for release must have a substantial basis for saying that the person is not dangerous.

■ In allocating the burden of proof, it must be remembered that the person seeking release has been duly committed as dangerous. His commitment, as in the case at bar, may have been relatively recent. He should, therefore, have the burden of going forward with the evidence on the issue of his suitability for release. *Ragsdale v. Overholser,* 281 F2d 943 (DC Cir 1960) ; *State ex rel. Barnes v. Behan,* supra.

As far as the standard of proof is concerned, some cases hold, in effect, that the patient must show beyond a reasonable doubt that he has recovered his "sanity".[⑳] We do not believe so strict a standard is required by our statute. If the patient can show by a preponderance of the evidence that his release will probably not be a danger to the public, the statutory purpose will be reasonably served. Therefore, we adopt the preponderance-of-evidence rule.

■ In summary, a person seeking release under ORS 136.730 must prove by a preponderance of the evidence (1) that he has the mental capacity to understand the difference between right and wrong, and (2) that with reasonable probability he will control his behavior so that his liberty will not be a danger to the public in the reasonably foreseeable future. He must prove both.

■ The ruling below must be reversed. The person in custody was discharged without a judicial finding

---

[⑳] It has been suggested that the court established a heavy burden to discourage recurrent petitions. Comment, 4 Willamette L J '64, 77, note 82 (1966). A better solution would be simply to hold that not enough time had passed since the last petition to warrant review.

that he was no longer dangerous. Since he had been committed as dangerous, there was no legal basis for his release. The trier upon another hearing must decide whether Kealey's liberty will endanger the public.

Reversed and remanded for a new hearing in which ORS 136.730 is to be applied as construed herein.