The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Manuel CHAVEZ, Defendant-Appellee.

No. 80SA187.

Supreme Court of Colorado,
En Banc.

June 1, 1981.

Stephan A. Tisdel, Dist. Atty., LaJunta, for plaintiff-appellant.

J. Gregory Walta, Colorado State Public Defender, Shelley Gilman, Deputy State

Public Defender, Colorado Springs, for defendant-appellee.

QUINN, Justice.

The People appeal from a judgment of the district court of Otero County holding section 16–8–105(4), C.R.S.1973 (1978 Rep. Vol. 8), unconstitutional as applied to the defendant, Manuel Chavez. That section requires the court to automatically commit a defendant found not guilty by reason of insanity to the department of institutions until such time as he is found eligible for release. The court concluded that the commitment of the defendant, without a precommitment hearing to determine his mental condition at the time of commitment, violated due process of law and equal protection of the laws under the United States and Colorado Constitutions. *U.S.Const.*, Amend. XIV; *Colo.Const.* Art. II, Sec. 25.[1] We find no constitutional infirmity in the defendant's commitment under the statutory scheme and we reverse and remand.

## I. *The District Court Proceedings*

The defendant was charged in a two-count information with attempt to commit second degree murder[2] and felony menacing.[3] The charges resulted from events on August 31, 1977, during which the defendant, then twenty-five years of age, attempted to stab Noberto Montanez, the common law husband of his sister.

On September 2, 1977, the district attorney moved for a determination of the defendant's competency to proceed, pursuant to section 16–8–110(2)(b), C.R.S.1973 (1978 Repl. Vol. 8).[4] The court ordered a competency examination at the Colorado State Hospital and, on the basis of the hospital's report, found the defendant incompetent to proceed by virtue of a mental disease, specifically "[s]chizophrenia, paranoid type, that renders him incapable of understanding the nature and course of the proceedings against him [or] of participating in his defense or cooperating with his defense counsel."[5] The court suspended the criminal proceeding and committed him to the department of institutions "until such time as he is found to be competent to proceed." Section 16–8–112(2), C.R.S.1973 (1978 Repl. Vol. 8).

On November 14, 1977, the superintendent of the state hospital filed a report with the court expressing the opinion that the defendant was now competent to proceed. Shortly thereafter the court held a restoration hearing pursuant to section 16–8–114(1), C.R.S.1973 (1978 Repl. Vol. 8),[6] and adjudicated the defendant restored to competency. On that same date the defendant entered a plea of not guilty by reason of insanity to the criminal charges previously filed, after having been advised by the court of the effect and consequences of the insanity plea, as required by section 16–8–103(4), C.R.S.1973 (1978 Repl. Vol. 8). The defendant was again committed to the Colorado State Hospital for a sanity examination.

The psychiatric report filed with the court contained a detailed description of the defendant's bizarre conduct in attempting to stab the victim at a motel in Rocky Ford, Colorado. According to the defendant's statement to the police after his arrest, he

1. The right to equal protection of the laws is included within the due process clause of the Colorado Constitution. *E.g., Heninger v. Charnes*, Colo., 613 P.2d 884 (1980); *People v. Max*, 70 Colo. 100, 198 P. 150 (1921).

2. Sections 18–2–101(1) and 18–3–103(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

3. Section 18–3–206, C.R.S.1973 (1978 Rep. Vol. 8).

4. Section 16–8–110(2) provides that the issue of a defendant's competency to proceed may be raised by the court on its own motion or by motion of the prosecution or defense.

5. Section 16–8–102(3), C.R.S.1973 (1978 Repl. Vol. 8), sets forth the test of incompetency:
 " 'Incompetent to proceed' means the defendant is suffering from a mental disease or defect which renders him incapable of understanding the nature and course of the proceedings against him or of participating or assisting in his defense or cooperating with his defense counsel."

6. A restoration hearing is "a hearing to determine whether a defendant who has previously been determined to be incompetent to proceed has become competent ...." Section 16–8–102(7), C.R.S.1973 (1978 Repl. Vol. 8).

"was sent to Colorado to free his sister from the bondage of her relationship with this man," whom he considered a "no-good drunk." The defendant believed it was his mission "to free all people from their bondage with the Devil." The examining psychiatrist concluded that the defendant was legally insane at the time of the commission of the crimes charged against him.

On December 7, 1977, the defendant waived a jury trial and the insanity issue was tried to the court. The only evidence offered and admitted at the trial was the report of the sanity examination. The court found the defendant not guilty by reason of insanity on both counts of the information and, pursuant to section 16–8–105(4), C.R.S.1973 (1978 Repl. Vol. 8), committed him "to the custody of the department of institutions until such time as he is found eligible for release."

On July 20, 1979, over a year and one-half after the insanity commitment, the defendant filed a motion for a statutory release hearing and a court ordered release examination.[7] Simultaneously, the defendant filed a motion for immediate release from commitment, claiming that the failure of section 16–8–105(4) to provide for a judicial determination of the defendant's mental condition and need for treatment at the time of the commitment violates due process of law, and that the substantial differences in procedure between a criminal insanity commitment and a civil commitment deny him equal protection of the laws.

The court ordered a release examination by the state hospital. The hospital report outlined the defendant's prior criminal record, his previous hospitalizations for mental treatment, and the course and current status of his present commitment. The defendant's prior criminal history included a 1971 conviction and reformatory sentence in New Mexico at age 17 for arson, followed by a 1973 burglary conviction and penitentiary sentence in New Mexico. He was released from this latter sentence on August 22, 1977, a few days prior to the attempted stabbing that ultimately resulted in his present commitment. His prior hospitalization included at least four institutional transfers to the New Mexico State Hospital during his previous incarcerations, with resulting diagnoses of latent schizophrenia, drug dependence and an inadequate-personality disorder. The defendant's course of conduct at the Colorado State Hospital since his commitment in December 1977 was marked by physical confrontations with other patients and an escape. According to the release examination report his present problems stemmed from schizophrenic thought processes, drug and alcohol abuse, assaultiveness and a lengthy antisocial background. It was the opinion of the superintendent of the state hospital that the defendant "continues to suffer from a mental disease or defect which is likely to cause him to be dangerous to himself, to others, or to the community in the reasonably foreseeable future" and, therefore, the defendant "is not eligible for release from hospital care and treatment."

The court conducted a trial on the issue of the defendant's eligibility for release.[8] The defendant testified that he was no

---

7. Section 16–8–115(1), C.R.S.1973 (1978 Repl. Vol. 8), requires the court to conduct a release hearing upon motion of the defendant made after one hundred eighty days following the date of the commitment order. Section 16–8–115(2), C.R.S.1973 (1978 Repl.Vol. 8), provides:
"If the question of defendant's eligibility for release is contested, the court shall order a release examination of the defendant when a current one has not already been furnished or when either the prosecution or defense moves for an examination of defendant at a different institution or by different experts. The court may order any additional or supplemental examination, investigation, or study which it deems necessary to a proper consideration and determination of the ques-

tion of eligibility for release. The court shall set the matter for release hearing after it has received all of the reports which it has ordered under this section. The hearing shall be to the court or on demand by the defendant to a jury of not to exceed twelve persons. If the question is contested, the burden of submitting evidence and the burden of proof by a preponderance of evidence shall be upon the party contesting the report of the chief officer of the institution having custody of the defendant."

8. As authorized by section 16–8–115(2), C.R.S. 1973 (1978 Repl.Vol. 8), the defendant waived his right to a jury trial on the release issue.

longer mentally ill and, upon his release, would be willing to undergo necessary treatment for his chronic problems with alcohol and other drugs. The defendant's other witness was his mother, who expressed a willingness to take him into her home. The state's evidence consisted principally of the testimony of a hospital staff psychiatrist. He described the defendant's stormy course of behavior at the hospital, stated that the defendant was presently suffering from chronic paranoid schizophrenia rendering him dangerous to himself and others, and described his prognosis as guarded.

On January 31, 1980, the court entered written findings of fact and conclusions of law. It concluded that although the defendant had failed to establish by a preponderance of the evidence his eligibility for statutory release, his commitment under section 16–8–105(4) violated due process of law and equal protection of the laws because he had not been given a precommitment hearing. Since the evidence at the release hearing established that the defendant continued to suffer from a mental disease or defect rendering him dangerous to himself and others in the reasonably foreseeable future, the court ordered that, upon completion of a seventy-two-hour evaluation pursuant to section 27–10–105(1)(b), C.R.S.1973 (1980 Supp.),[9] any subsequent commitment for treatment would be effected under those statutory provisions dealing with the care and treatment of the mentally ill. Section 27–10–101 *et seq.*, C.R.S.1973 (1978 Repl.Vol. 8).[10]

■ The People on this appeal contest the trial court's determination that, as applied to the defendant, the statutory procedures for automatic commitment upon an adjudication of insanity are constitutionally flawed. We conclude that the commitment of the defendant pursuant to section 16–8–105(4), without a precommitment hearing, did not violate due process of law. We also conclude that the differences in the commitment procedures and standards of release for criminal and civil commitments do not violate equal protection of the laws.

## II. *Due Process of Law*

■ The trial court found the automatic commitment procedures of section 16–8–105(4) constitutionally lacking in due process of law because they deprived the defendant of a constitutionally protected liberty interest without a prior hearing. When dealing with due process a bifurcated analysis is appropriate. The first consideration relates to the nature of the interest and the second to the character of the process.

■ The first inquiry is whether the order of commitment deprived the defendant of "liberty", as that term is used in the Fourteenth Amendment to the United States Constitution and Article II, Section 25 of the Colorado Constitution. *See Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Coleman v. Darden*, 595 F.2d 533 (10th Cir. 1979), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). It can no longer be doubted that commitment to a mental institution constitutes a severe infringement on the basic interest of an individual to be free from governmental restraint and thus requires due process protection. *Vitek v. Jones, supra; Addington v. Texas*, 441

---

**9.** Section 27–10–105(1)(b), C.R.S.1973 (1980 Supp.), permits a seventy-two-hour emergency treatment and evaluation under the following circumstances:

"Upon an affidavit sworn to or affirmed before a judge which relates sufficient facts to establish that a person appears to be mentally ill and, as a result of such mental illness, appears to be an imminent danger to others or to himself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or ap-

proved by the executive director for a seventy-two-hour treatment and evaluation."

In lieu of an affidavit, the court based its action on the testimony elicited at the release hearing.

**10.** Throughout this opinion our use of such terminology as "civil commitment" and "involuntary civil commitment" is intended as a shorthand reference to the statutes dealing with the care and treatment of the mentally ill, which are found in Article 10 of Title 27, C.R.S. 1973.

U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *People v. Taylor*, Colo., 618 P.2d 1127 (1980); *Goedecke v. State Dept. of Institutions*, 198 Colo. 407, 603 P.2d 123 (1979); *People v. Lane*, 196 Colo. 42, 581 P.2d 719 (1978).

 Once it is determined that due process applies, the second inquiry is "what process is due?" *Morrissey v. Brewer, supra*, 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494. Due process is a flexible standard and recognizes that "not all situations calling for procedural safeguards call for the same kind of procedure." *Id.; see also Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Chiappe v. State Personnel Board*, Colo., 622 P.2d 527 (1981); *People v. Taylor, supra; In re Franklin*, 7 Cal.3d 126, 101 Cal.Rptr. 553, 496 P.2d 465 (1972). In the context of a commitment to a mental institution three factors have been isolated as pertinent to a due process analysis: (1) the weight of the governmental interest in the automatic commitment process; (2) the severity of the deprivation suffered by the individual as a result of the governmental action; and (3) the functional appropriateness of the disputed procedures for minimizing the risk of an erroneous decision in resolving the competing claims of the parties. *E. g., Vitek v. Jones, supra; Addington v. Texas, supra; see generally* Note, *Specifying the Procedures Required by Due Process: Toward Limits on the Use of Interest Balancing*, 88 Harv.L.Rev. 1510 (1975).

No one here questions the state's interest in committing those who, due to a mental illness, have committed acts dangerous to the safety of others and the well being of society. *See, e. g., Addington v. Texas, supra; People v. Howell*, 196 Colo. 408, 586 P.2d 27 (1978). Likewise, no one disputes the severity of deprivation of one's liberty interest in freedom from involuntary commitment to a mental hospital—an interest at the very core of those interests protected by the due process clause. *See, e. g., Vitek v. Jones, supra; Addington v. Texas, supra; Jackson v. Indiana, supra; Humphrey v.*

*Cady, supra; Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *Goedecke v. State Dept. of Institutions, supra; People v. Lane, supra*. The central issues in this case are whether, under the statutory scheme, an acquittal by reason of insanity provides a legitimate basis for the automatic commitment of the defendant so adjudicated, and whether the statutory burden of proof for release accords with due process standards.

### A.

 Generally, criminal liability requires the concurrence of an unlawful act and a culpable mental state. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *People v. Marcy*, Colo., 628 P.2d 69 (1981). A person lacking the mental capacity to commit a crime cannot be held criminally responsible for his actions. *E. g., People ex rel. Juhan v. District Court*, 165 Colo. 253, 439 P.2d 741 (1968). In keeping with these basic principles of criminal law, the Colorado Criminal Code states that "[a] person who is insane . . . is not responsible for his conduct defined as criminal." Section 18–1–802, C.R.S.1973 (1978 Repl.Vol. 8). The statutory test of insanity is defined in section 16–8–101, C.R.S.1973 (1978 Repl.Vol. 8), as follows:

"A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the willpower and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law."

■ A plea of not guilty by reason of insanity is a plea in the nature of confession and avoidance. *Labor v. Gibson*, 195 Colo. 416, 578 P.2d 1059 (1978); *Boyd v. People*, 108 Colo. 289, 116 P.2d 193 (1941). "By asserting it the defendant admits the acts charged, but denies criminal culpability." *Leick v. People*, 136 Colo. 535, 546, 322 P.2d 674, 681 (1958), *cert. denied*, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958). The defendant's denial of guilt is predicated on a claim of mental disease or defect which, by reason of its existence, relieves him of criminal responsibility for his conduct. *See Lynch v. Overholser*, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

■ The consequences of an insanity adjudication on the liberty interest of an accused are clearly spelled out in section 16–8–105(4), C.R.S.1973 (1978 Repl.Vol. 8): "If the trier of fact finds the defendant not guilty by reason of insanity, the court shall commit the defendant to the custody of the department of institutions until such time as he is found eligible for release." [11] Statutory procedure requires the court to advise the defendant of these consequences before accepting an insanity plea. Section 16–8–103(4), C.R.S.1973 (1978 Repl.Vol. 8). Given the statutory scheme, it cannot be disputed that the entry of the plea itself extinguishes any real or reasonable expectation by the defendant of an immediate release upon an insanity adjudication.

■ Section 16–8–105(2) provides that "[e]very person is presumed to be sane; but, once any evidence of insanity is introduced, the people have the burden of proving sanity beyond a reasonable doubt." *See People v. Kernanen*, 178 Colo. 234, 497 P.2d 8 (1972); *People ex rel. Juhan v. District Court, supra; Castro v. People*, 140 Colo. 493, 346 P.2d 1020 (1959); *Leick v. People, supra*. In one sense an adjudication of insanity represents a judicial determination that the prosecution has failed to prove the defendant's sanity beyond a reasonable doubt. *E. g., Labor v. Gibson, supra; Parks v. District Court*, 180 Colo. 202, 503 P.2d 1029 (1972); *People ex rel. Juhan v. District Court, supra*. Even under this interpretation it has been held that a judicially determined doubt as to an accused's sanity provides a sufficient warrant for immediate commitment and further examination as to his present mental condition. *E. g., Bolton v. Harris*, 395 F.2d 642, 651 (D.C.Cir. 1968); [12] *Ragsdale v. Overholser*, 281 F.2d 943 (D.C.Cir.1960); *State v. Alto*, Alaska, 589 P.2d 402 (1979); *People v. McQuillan*, 392 Mich. 511, 221 N.W.2d 569 (1974).

In another sense, however, particularly in view of the statutory presumption of sanity in the first instance, it is not unreasonable to infer from an insanity adjudication that the accused suffered from a mental disease or defect at the time he engaged in the proscribed conduct. A finding of not guilty by reason of insanity generally will be based on some evidence of insanity sufficient to overcome the contrary presumption. *See People v. Kernanen, supra*.[13] Nor is it unfair or unreasonable to believe

**11.** Section 16–8–105(4), C.R.S.1973 (1978 Repl. Vol. 8), further provides:

"The executive director of the department of institutions shall designate the state facility at which the defendant shall be held for care and psychiatric treatment and may transfer the defendant from one institution to another if in the opinion of the director it is desirable to do so in the interest of the proper care, custody, and treatment of the defendant or the protection of the public or the personnel of the facilities in question."

**12.** In *Bolton* the Court of Appeals for the District of Columbia also held that after the period of observation and examination had been completed, the defendant was entitled to release unless the government could prove a present mental illness by a preponderance of evidence.

Congress reacted by placing on the committed defendant the burden of proving that he was no longer mentally ill. *D.C.Code Encycl.* § 24–301(k)(3) (1970 Supp.).

**13.** Indeed, in this case the trial court's adjudication of insanity was predicated on more substantial grounds than a mere failure of proof on the issue of sanity. The trial court expressly found that the defendant, at the time of the commission of the offenses, was suffering from a mental disease, namely a schizophrenic reaction, paranoid type, to such a degree as to be incapable of distinguishing right from wrong with respect to his conduct, or even if able to so distinguish, was incapable of choosing the right and refraining from the wrong.

that the disorder likely is a continuing one since mental illness for the most part is a long lasting phenomenon. *See, e. g.*, Weihofen, *Institutional Treatment of Persons Acquitted by Reason of Insanity*, 38 *Tex.L. Rev.* 849 (1960); Note, *Commitment Following Acquittal by Reason of Insanity and the Equal Protection of the Laws*, 116 *U.Pa. L.Rev.* 924, 935 (1968); Comment, *Compulsory Commitment Following a Successful Insanity Defense*, 56 *Nw.U.L.Rev.* 409, 451 (1961). For this reason the law recognizes that an insanity adjudication results in a presumptive continuation of a state of mental incapacity until it is shown that sanity has been restored. *See, e. g., People v. Kernanen, supra; In re Franklin, supra; In the Matter of Lewis*, 403 A.2d 1115 (Del. 1979); *Mills v. State*, 256 A.2d 752 (Del. 1969); *State v. Allan*, 166 N.W.2d 752 (Iowa 1969); *State ex rel. Barnes v. Behan*, 80 S.D. 370, 124 N.W.2d 179 (1963).

 We conclude that where, as here, the defendant has been adjudicated not guilty by reason of insanity for acts which, but for his insanity, would be punishable as crimes, that adjudication furnishes a legitimate basis for the immediate commitment of the defendant to an institution for observation and examination, as well as any needed treatment, so that a reliable determination might be made of his mental condition and what danger, if any, he poses to himself and others. In this respect we follow a substantial number of courts that have addressed this issue. *See, e. g., Bolton v. Harris, supra; State v. Alto, supra; State v. Clemons*, 110 Ariz. 79, 515 P.2d 324 (1973); *In re Franklin, supra; In re Lewis, supra; State v. Allan, supra; Chase v. Kearns*, 278 A.2d 132 (Me.1971); *People v. McQuillan, supra; People v. Lally*, 19 N.Y.2d 27, 227 N.Y.S.2d 654, 224 N.E.2d 87 (1966); *Newton v. Brooks*, 246 Or. 484, 426 P.2d 446 (1967); *State ex rel. Barnes v. Behan, supra.*

### B.

 Although the adjudication of not guilty by reason of insanity furnishes a legitimate basis for the immediate commitment of a defendant to a psychiatric facility, his weighty liberty interest in avoiding confinement demands that he be given an opportunity to controvert the presumed need for commitment. However, to accord the defendant a right to a hearing on this issue is not to say that the hearing must precede the insanity commitment. Due process of law shuns that type of procedural inflexibility which becomes an end in itself. Not all situations calling for procedural safeguards require the same kind of procedure. *E. g., Mathews v. Eldridge, supra; Morrissey v. Brewer, supra.* The procedures required to minimize error and reduce the dangers of arbitrary action vary with specific factual contexts. *See, e. g., Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer, supra.*

No penal or punitive considerations underlie the state's interest in automatic commitment. The primary purpose of an immediate commitment is to furnish the state with an opportunity to assess the defendant's mental status and to determine whether he likely will pose a danger to himself or others upon his release. Pending the outcome of this evaluative process the statutory scheme contemplates that the defendant's present need for care and treatment simultaneously will be addressed. Section 16–8–105(4), C.R.S.1973 (1978 Repl. Vol. 8).[14] The Circuit Court of Appeals in *Ragsdale v. Overholser, supra*, 281 F.2d 943, 948 (D.C.Cir.1960), pointed up the futility of an immediate precommitment hearing upon an insanity adjudication:

> "... [S]uch a hearing would be meaningless until trained medical experts had a

14. The processes involved in an evaluation of present mental status and the likelihood of danger present difficult questions for psychiatric diagnosis which, to a large extent, is "based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." *Addington v. Texas*, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323, 333 (1979). Continued observation and testing in a psychiatric facility over a reasonable period of time are essential to an accurate diagnosis of a person's present mental status and an informed prognosis concerning future conduct.

reasonable opportunity to observe and examine the subject and report their finding. Hence some time gap between the verdict and the appraisal of the defendant's then existing mental condition is unavoidable under any scheme which would provide adequate safeguards."

The governmental interest in preventing future harm to others must be considered. In those cases where mental illness and a likely danger to others are indicated, present confinement in a psychiatric facility is indispensable to both the safety of others and the defendant's own restoration. Thus, we believe that automatic commitment, considered by itself, represents "a judicious weighing of the public's right to be protected from possibly dangerous mentally ill persons against the individual defendant's right to be protected against unjustified commitment." *People v. McQuillan, supra,* 392 Mich. at 528, 221 N.W.2d at 576.

In the context of due process of law the procedures authorized under the statutory scheme are calculated to insure against the risk of continued detention without cause and, to that extent, represent an adequate

substitute for an immediate precommitment hearing. Section 16–8–120(1), C.R.S. 1973 (1978 Repl.Vol. 8), sets forth as the standard for release or conditional release from an insanity commitment "[t]hat the defendant has no abnormal mental condition which would be likely to cause him to be dangerous either to himself or to others or to the community in the reasonably foreseeable future." Section 16–8–115(1), C.R.S.1973 (1978 Repl.Vol. 8), not only grants the defendant the unconditional right to a hearing upon motion made after 180 days following the commitment order, but also permits the court to order a release hearing *at any time* on its own motion. Furthermore, an expedited release by the hospital authority is authorized when it determines the defendant no longer requires hospitalization. Section 16–8–116(1), C.R.S.1973 (1978 Repl.Vol. 8).[15]

In establishing a period of six months during which the defendant is not entitled to a release hearing as a matter of right, the General Assembly undoubtedly considered this period as necessary for adequate observation.[16] Given the uncertain-

15. The expedited procedure of section 16–8–116, C.R.S.1973 (1978 Repl.Vol. 8), is as follows:

"(1) When the chief officer of the institution in which a defendant has been committed under this article determines that the defendant no longer requires hospitalization because he no longer suffers from a mental disease or defect which is likely to cause him to be dangerous to himself, to others, or to the community in the reasonably foreseeable future, such chief officer shall report this determination to the court that committed the defendant, including in the report a report of examination equivalent to a release examination. The clerk of the court shall forthwith furnish a copy of the report to the prosecuting attorney and to counsel for the defendant.

"(2) Thirty days after receiving the report of the chief officer of the institution having custody of the defendant, the court shall order the discharge of the defendant in accordance with section 16–8–115(3), unless before that day the district attorney notifies the court that the report is contested.

"(3) If the report is contested and timely notice given, the court shall conduct a release hearing and proceed as provided in section 16–8–115."

In addition section 16–8–118, C.R.S.1973 (1978 Repl.Vol. 8), authorizes treatment and rehabili-

tation activities, including the temporary physical removal from the institution, during any period of time.

16. In this respect the General Assembly followed the recommendations of the Model Penal Code. Under section 4.08(1) of the Code (Tent. Draft No. 4, 1955), one acquitted by reason of insanity is automatically committed to the custody of a commissioner of public health for placement in an appropriate institution for custody, care and treatment. Subsection 4.08(5) permits the person so committed to apply for release, but

"no such application ... need be considered until he has been confined for a period not less than [six months] from the date of the order of commitment, and if the determination of the Court be adverse to the application, such person shall not be permitted to file a further application until [one year] has elapsed from the date of any preceding hearing on an application for his release or discharge."

*Model Penal Code* § 4.08(5). Although the comment to § 4.08 indicates that the periods of "six months" and "one year" are not immutable, *Model Penal Code* § 4.08 (1962 Proposed Official Draft at 77), the commentators also

ties and variables of psychiatric diagnosis and prognosis, we cannot say that the legislative choice of a six month period of initial commitment violates due process. *See In re Franklin, supra; cf. Bolton v. Harris, supra* (90 day term of temporary commitment before hearing on present mental condition upheld); *People v. McQuillan, supra* (judicially authorized term of 60 days for examination pending enactment of specific legislation establishing a definite period). In the absence of a showing that the time fixed is unreasonable in length and unrelated to purpose—and no such showing was made in this case—we defer to the legislature's decision in this matter.

■ We therefore hold that a defendant acquitted by reason of insanity is not denied due process of law by an immediate and automatic commitment to a psychiatric facility so long as there are available to him procedures similar to those in section 16–8–115, C.R.S.1973 (1978 Repl.Vol. 8), which provide an opportunity for release within a reasonable time after commitment by demonstrating that he is no longer suffering from a mental illness likely to cause him to be dangerous to himself or to others in the reasonably foreseeable future.

### C.

Although the trial court concluded the statutory burden of proof in a release hearing is reasonably related to the governmental interest in public safety,[17] the defendant argues that it violates due process of law.

state that a defendant's release application is "limited by what is thought to be the period of time necessary to observe him initially (six months) and by the interval probably necessary for a significant change in his condition to occur after any application has been denied (one year)." *Model Penal Code* § 4.08, comment at 200–201 (Tent. Draft No. 4, 1955).

17. The trial court's holding that the automatic commitment procedures, as applied to the defendant, violated due process and equal protection was restricted to that aspect of the statutory scheme which denied the defendant a precommitment hearing. The defendant's constitutional claim relating to the burden of proof was expressly rejected by the court.

18. Under section 16–8–115(2) the burden of proof in a release hearing will not always be on

We agree with the trial court and reject the defendant's claim.

■ Section 16–8–115(2) provides that upon motion of the defendant made after 180 days following his commitment, the court shall order a release hearing upon the contested report of the chief officer of the institution in which the defendant is committed. If the defendant's eligibility for release is contested, then "the burden of submitting evidence and the burden of proof by a preponderance of evidence shall be on the party contesting the report of the chief officer of the institution having custody of the defendant." Section 16–8–115(2), C.R.S.1973 (1978 Repl.Vol. 8).[18]

■ The United States Supreme Court in *Addington v. Texas, supra,* 441 U.S. at 423, 99 S.Ct. at 1808, 60 L.Ed.2d at 329, noted that the function of a standard of proof is "to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision."[19] *See also People v. Taylor, supra.* Placing the burden of proof on the defendant to prove his eligibility for release, when the chief officer of the institution determines the defendant is not presently eligible, does not violate due process of law. In such a case three events already will have occurred which render this statutory allocation permissible: (1) there will have been a judicial determination of probable cause to believe that the defendant committed the acts charged against him as

the defendant. If the chief officer of the institution determines that the defendant is eligible for release, the burden will be upon the prosecuting attorney to establish the defendant's ineligibility for release.

19. In *Addington,* the Supreme Court held that in a civil commitment proceeding due process requires the state to establish the need for commitment by clear and convincing evidence. The uncertainties of psychiatric diagnosis and the risk of an erroneous confinement based upon a few isolated instances of unusual or idiosyncratic behavior justify the imposition of the intermediate standard of proof upon the party seeking the involuntary commitment of another.

a crime, section 16–8–103(3), C.R.S.1973 (1978 Repl.Vol. 8); (2) there will have been an adjudication that at the time of the commission of the offense the defendant was legally insane; and (3) the chief officer of the institution to which the defendant has been committed will have found him ineligible for release by reason of a mental disease or defect likely to cause him to be dangerous to himself, to others, or to the community, in the reasonably foreseeable future, sections 16–8–102(4) and 16–8–115, C.R.S.1973 (1978 Repl.Vol. 8).

The placement of the burden of proof on the defendant in those cases where he is contesting the institutional determination of his ineligibility for release protects society against the danger posed by an erroneous decision on that issue. As we observed in *People v. Howell*, 196 Colo. 408, 413–14, 586 P.2d 27, 31 (1978):

> "Because of the prior judicial determination that his abnormal mental condition rendered him not accountable for two homicides, the public has a special interest in his continued confinement for the safety of others. Thus, when he seeks release claiming he is no longer dangerous, and the hospital after examination and evaluation disagrees, it is neither unfair nor irrational to require that he bear the burden of proving he is no longer dangerous to himself or others. *Accord, In re Franklin*, 7 Cal.3d 126, 101 Cal.Rptr. 553, 496 P.2d 465 (1972); *State v. Allan*, 166 N.W.2d 752 (Iowa 1969); *Newton v. Brooks*, 246 Or. 484, 426 P.2d 446 (1967)."

*See also People v. Logan*, 196 Colo. 573, 588 P.2d 870 (1979); *State v. Alto, supra; Chase v. Kearns, supra; State ex rel. Barnes v. Behan, supra.* Accordingly, we find no constitutional infirmity in the burden of proof allocation of section 16–8–115(2).

### III. *Equal Protection of the Laws*

The trial court held that the defendant's automatic commitment was constitutionally infirm because there was no justifiable basis for denying him the type of precommitment hearing provided to persons civilly committed. Contrary to the trial court, we conclude that the statutory requirement of an automatic commitment does withstand constitutional scrutiny under an equal protection analysis.

"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Baxstrom v. Herold*, 387 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620, 624 (1966); *see also Jackson v. Indiana, supra; Specht v. Patterson, supra; People v. Taggart*, Colo., 621 P.2d 1375 (1981); *Lee v. People*, 170 Colo. 268, 460 P.2d 796 (1969). In the absence of a suspect classification[20] or an intrusion on a fundamental right, the traditional standard of review requires that the challenged classification "bear some rational relationship to legitimate state purposes." *San Antonio School District v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16, 47 (1973).[21] No suspect classification is involved here. Nor does the automatic commitment requirement impli-

**20.** Suspect classifications include race, nationality and alienage as the more obvious categories. *See Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Wealth discrimination also has been treated as a suspect classification, especially in the context of criminal trial and appellate processes. *E. g., Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). When a suspect classification is established, or a fundamental constitutional right is involved, strict judicial scrutiny is applied under an equal protection analysis. Under strict judicial scrutiny there must be a "necessary relationship" between the statutory

classification and a "compelling governmental interest," and the statute must be tailored precisely to meet the governmental objective. *See San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

**21.** An intermediate level of scrutiny, usually employed in gender discrimination cases, requires that there be a "substantial relationship" between the statutory classification and an "important governmental interest." *E. g., Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). We express no opinion in regard to whether the automatic commitment requirement would satisfy a more heightened level of scrutiny than the rational basis test.

cate a fundamental right. Although a commitment to a mental institution constitutes a significant deprivation of liberty, *see, e. g., Vitek v. Jones, supra; Addington v. Texas, supra; Humphrey v. Cady, supra; Baxstrom v. Herold, supra*, a person found not guilty by reason of insanity enjoys no fundamental right to unrestricted liberty upon that adjudication.[22] *See* Part IIA, *supra*. A standard of scrutiny stricter than that of the rational basis criterion would be inappropriate under the circumstances of this case.

■■■ The governmental interest which the automatic commitment procedure purportedly serves is clearly identified as that of public safety. The state has a legitimate interest in protecting the public from those who previously have engaged in overt criminal conduct but have been relieved of criminal responsibility by reason of legal insanity. *See People v. Logan, supra; People v. Howell, supra*. Consequently, the significant question presented here is whether the differences in the commitment and release requirements for insanity adjudications are rationally related to the state's interest in public safety.

### A.

The procedures governing civil commitments are found in section 27–10–101 *et seq.*, C.R.S.1973. Section 27–10–105, C.R.S. 1973 (1980 Supp.), authorizes an emergency procedure for treatment and evaluation of the mentally ill. Under this procedure a peace officer or professional person having probable cause to believe a person is mentally ill, and is an imminent danger to others or himself, or is gravely disabled, may take or cause to be taken such person into custody for placement in a facility designated by the executive director of the department of institutions for a seventy-two-hour

treatment and evaluation. Upon the expiration of this period, persons so detained must be released, referred for further care and treatment on a voluntary basis, or certified for treatment pursuant to the provisions of section 27–10–107, C.R.S.1973, which are hereafter described. In lieu of this emergency procedure, section 27–10–106(2), C.R.S.1973, authorizes any individual to petition the court for a mental evaluation of another (respondent) "who appears to be mentally ill and, as a result of such mental illness, appears to be a danger to others or to himself or appears to be gravely disabled. . . ." Upon receipt of the petition the court designates a facility to screen the respondent and to determine whether there is probable cause to believe the allegations of the petition. Section 27–10–106(4), C.R.S.1973 (1980 Supp.). If the court determines from the screening report that probable cause exists, it then orders a seventy-two-hour treatment and evaluation by an appropriate facility in the event the respondent refuses to accept evaluation voluntarily. Section 27–10–106(6), C.R.S.1973 (1980 Supp.). Upon the filing of a certification by a mental treatment and evaluation facility that the respondent is mentally ill and, as a result thereof, constitutes a danger to himself or others, or is gravely disabled, sections 27–10–107(1) and 27–10–109(1), C.R.S.1973, the respondent becomes entitled to a precommitment hearing, with the burden of proof upon the person or facility seeking the detention to establish the need therefor by clear and convincing evidence, section 27–10–111(1), C.R.S.1973 (1980 Supp.). *See People v. Taylor, supra.*

■■■ Although the differences in commitment procedures for individuals adjudicated criminally insane are not insignificant in comparison to the statutory procedures for civil commitments,[23] these differences

---

**22.** It would be inconsistent to hold that, for purposes of due process, a defendant adjudicated criminally insane may be automatically committed to a mental facility and also to determine that, for purposes of equal protection, such a defendant enjoys a "fundamental right" to be free from commitment to a mental institution.

**23.** We are not dealing with a statutory contrariety that grants the person civilly committed the right to a hearing on the need for treatment and totally denies any such right to the person criminally committed. *Cf. Baxtrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) (equal protection violated where state statutory scheme provided a jury review in all civil commitments but excluded prisoners awaiting expiration of criminal sentence); *Bol-*

are justified by the public safety interests involved in an insanity adjudication. Civil commitment procedures anticipate that some petitions seeking the commitment of another might be based on nothing more than unusual or eccentric behavior and thus devoid of any real basis for commitment. Placing the burden on the party seeking the detention of another "is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered." *Addington v. Texas, supra,* 441 U.S. at 427, 99 S.Ct. at 1810, 60 L.Ed.2d at 331. Furthermore, the person whose commitment is sought often will disclaim the existence of a mental illness requiring institutional care and treatment. Finally, and most importantly, the statutory procedures for civil commitment are not intended to apply to those persons whose illness has resulted in criminal conduct. In contrast, a defendant acquitted by reason of insanity will have asserted his mental illness as a defense to criminal conduct; there will already have been a judicial determination of probable cause that he engaged in the criminal act, section 16–8–103(3), C.R.S. 1973 (1978 Repl.Vol. 8); and there will have been an actual adjudication that he was legally insane when he participated in the offense charged against him.

■ The assertion of the insanity defense and the judicial determination implicit in the insanity adjudication—that the accused engaged in criminal conduct as a result of mental disease or a questionable state of legal sanity—place the legally insane defendant in a special class of persons posing an imminent danger to public safety if immediately released from detention. The Supreme Court of Maine addressed the issue of automatic commitment in *Chase v. Kearns, supra,* and cogently observed:

> " ... [T]he finding ... that a defendant, because of his mental disease or defect, shall be held blameless for an act otherwise subject to criminal sanctions puts such a defendant into an exceptional class. The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger." *Id.* at 138.[24]

This rationale finds support in other cases, *e. g., United States v. Ecker,* 543 F.2d 178 (D.C. Cir. 1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *State v. Alto, supra; In re Franklin, supra; In re*

---

ton v. Harris, 395 F.2d 642 (D.C. Cir. 1968) (equal protection violated where a defendant adjudicated criminally insane not entitled to a release hearing as of right, but only upon hospital director's recommendation). As previously noted, for purposes of due process, section 16–8–115(1), C.R.S.1973 (1978 Repl.Vol. 8), does provide the criminally committed defendant a reasonable opportunity to demonstrate his eligibility for release and constitutes an adequate substitute for a precommitment hearing.

Under section 16–8–115(1), C.R.S.1973 (1978 Repl.Vol. 8), a defendant adjudicated not guilty by reason of insanity is entitled to a post-commitment hearing as of right after 180 days following the order of commitment, and, if found ineligible for release, he has the right to periodic release hearings after any order of recommitment. As noted in Part IIB, *supra,* these statutory post-commitment hearings provide an adequate safeguard against the unauthorized prolongation of the term of commitment. In this respect they are not dissimilar in purpose to civil commitment procedures in

connection with long-term care and treatment for those previously certified for short-term treatment. Section 27–10–109, C.R.S.1973.

**24.** We recognize, as the court did in *Chase,* that under Maine's statutory structure an insanity adjudication involves an affirmative finding, by a fair preponderance of the evidence, that the criminal conduct was the result of a mental disease or defect. However, as discussed in Part IIA, the character of the insanity plea as one in the nature of confession and avoidance, the presumption of sanity in the first instance, and the reasonable inference of a mental disease (or at the very least a doubtful state of legal sanity) from an insanity adjudication, when considered in their totality, are sufficient to place the defendant in the exceptional class mentioned in *Chase.* See, e. g., Ragsdale v. Overholser, 281 F.2d 943 (D.C. Cir. 1960); *State v. Alto,* Alaska, 589 P.2d 402 (1979); *People v. McQuillan,* 392 Mich. 511, 211 N.W.2d 569 (1974).

*Lewis, supra; Mills v. State, supra,* and we find it persuasive under the circumstances here present.

The requirement of automatic commitment protects the public from the commission of other criminal acts pending a psychiatric determination of the defendant's mental status and of the danger he likely poses to others. Furthermore, the period of six months, before which the defendant is not entitled to a release hearing as of right, is calculated to permit accuracy in diagnosis and a reasonable degree of psychiatric probability in prognosis. Thus, we are satisfied that these differences between commitment procedures in insanity adjudications and those applicable to civil commitment are reasonable in light of the public safety purposes served by the automatic commitment requirement.

### B.

■ Although the trial court found no constitutional flaw in the different release standards applicable to civil and criminal commitments, the defendant argues that such a differential violates equal protection. We are not persuaded by the defendant's argument.

■ Section 27–10–110(1), C.R.S.1973 (1980 Supp.), permits the release of a person civilly committed when, in the opinion of the professional person in charge of treatment, he "has received sufficient benefit from such treatment for him to leave." The burden of proof is upon the person or facility seeking continued detention to establish the need for such detention by clear and convincing evidence. Section 27–10–111(1), C.R.S.1973 (1980 Supp.); *People v. Taylor, supra.* In contrast, section 16–8–120(1), C.R.S.1973 (1978 Repl.Vol. 8), provides that a defendant criminally committed by reason of insanity can be released upon a showing that he "has no abnormal mental condition which would be likely to cause him to be dangerous either to himself

or to others or to the community in the reasonably foreseeable future." The burden of proof rests on the party contesting the recommendation of the chief officer of the custodial institution to establish the contrary by a preponderance of evidence. Section 16–8–115, C.R.S.1973 (1978 Repl. Vol. 8). These differences in the statutory standards of release are justified by the respective purposes of civil and criminal commitments.

The primary purpose of a civil commitment is to secure such treatment as is suited to the needs of the person under conditions which are as least restrictive of liberty as practicable. *See* sections 27–10–101(1) and 27–10–117(1), C.R.S.1973. The legislative choice of less restrictive conditions of release (as well as of confinement) for persons civilly committed is a recognition that their illness has not manifested itself in overt criminal conduct inimical to the social order and dangerous to others. In contrast, a defendant adjudicated criminally insane has demonstrated by his conduct, as in this case, a likely illness and corresponding danger more threatening to the safety of others. The more stringent standards of release applicable to the criminally committed defendant reflect the increased risk to the public associated with the release decision and, as in the case of automatic commitment, they are reasonably related to the state's interest in public safety. *E. g., United States v. Ecker, supra; People v. Logan, supra; People v. Howell, supra; State v. Alto, supra; In the Matter of Lewis, supra.*

The trial court in this case expressly concluded at the release hearing that the defendant continues to suffer from a mental disease and as a result "constitutes an imminent threat to himself and others." With such a determination section 16–8–115(3), C.R.S.1973 (1978 Repl.Vol. 8), requires the court to recommit the defendant.[25]

---

**25.** In his brief the defendant also argues that the automatic commitment upon an insanity adjudication violates equal protection by treating those acquitted by reason of insanity differently from those acquitted on the basis of some other affirmative defense. Further, he claims

his commitment and detention violate cruel and unusual punishment. We do not address these issues. They were neither raised by the defendant in the trial court, nor were they addressed by the court at any stage of the proceedings below.

The judgment is reversed and the cause is remanded to the district court with directions to proceed in accordance with the views herein expressed.