Dr. Haydee **KORT,** Superintendent, Colorado State Hospital; Dr. Frank Traylor, Executive Director, Colorado Department of Institutions; and the State of Colorado, Petitioners,

v.

Ross Michael **CARLSON,** Defendant; the Honorable Edward C. Day, Judge, Eighteenth Judicial District; and the District Court of the Eighteenth Judicial District of Colorado, Respondents.

No. 86SA31.

Supreme Court of Colorado,
En Banc.

July 14, 1986.
Rehearing Denied Aug. 25, 1986.

**144**

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Carolyn Lievers, Asst. Atty. Gen., Denver, for petitioners.

David B. Savitz and Walter L. Gerash, Denver, for respondents.

DUBOFSKY, Justice.

In this original proceeding brought by officials of the Colorado Department of Institutions (department) we issued a rule to show cause why orders of the respondent District Court of the Eighteenth Judicial District in a criminal proceeding against the defendant, Ross Michael Carlson, should not be vacated. The district court granted the defendant's motions to appoint a private psychotherapist chosen by the defendant to treat him at the state psychiatric hospital and to require the state to pay the therapist's fees. The court also ordered the executive director of the department to seek a supplemental appropriation for payment of the therapist and to include his fees in the department's annual budget. We hold that the district court exceeded its authority in entering the challenged orders, and we make the rule absolute.

The defendant is charged with first degree murder for the deaths of his parents. On July 10, 1984, the respondent district court found the defendant incompetent to stand trial and committed him to the Colorado State Hospital (CSH) in Pueblo. *See* §§ 16–8–110, –111, and –112, 8 C.R.S. (1978 and 1985 Supp.). The commitment order contained detailed findings and treatment recommendations. The district court found that "[t]he defendant is suffering from a multiple personality disorder disease or defect which is an unusual disorder, is often misdiagnosed and requires very special and specific treatment which differs from the treatment required for other forms of mental disease." The court recommended that:

The facility treating the defendant should:

1) establish and develop a commitment to the diagnosis of multiple personality disorder within the patient; consultations should be sought with the patient's experts on the etiology and diagnostic features of this disorder, if needed;

2) become familiar with patient's history and background, his various personalities and their respective characteristics and functions and develop a treatment alliance with him;

3) devise and design an individualized treatment plan for the patient with respect to his disorder and the treatment problems inherent in the disorder; consultations should be sought with patient's experts on the various techniques and modalities which have proved successful in the treatment of this disorder;

4) appoint a skilled and experienced therapist with a solid background in psychodynamics psychotherapy (not psychoanalytical therapy) who will be responsible for developing, coordinating and carrying out to conclusion the patient's treatment plan; the therapist should be committed to the therapist-patient relationship, be technique oriented and be skilled in the use of hypnosis as part of the psychodynamics psychotherapy;

5) consider the following general approach in the treatment of the patient:

a) develop an alliance with each personality;

b) understand the function played by each personality and the part each plays within the patient as a whole;

c) gradually explore and discover the early traumatic experiences which precipitated the evolution of each of the personalities;

d) work through with the patient the early traumatic experiences which precipitated the original dissociation and utilize hypnosis, videotape review and other appropriate modalities in this process;

e) understand that the patient has dissociated in the face of overwhelming stress and that this propensity may occur in therapy, thus, interpret and restructure dissociation rather than suppress, ignore or medicate it;

f) gradually dissolve the amnesia barriers so that the patient can recover all of the experiences that he apportioned off to his alternate personalities;

g) seek to have all of the personalities identify with one another, to empathically accept the other's feelings, and to share an awareness of what was denied;

h) be aware that relapses may occur after fusion between two or more of the personalities;

i) subsequent to fusion, work with the patient to concentrate on the gains made after fusion and to develop a set of skills to adapt appropriately at the time of release.

About a year and a half after commitment the defendant refused to participate in the therapy program that CSH had established to implement the court's recommendations. Subsequently, the department filed a motion asking the district court to review the defendant's nonparticipation and to order him to cooperate in the hospital's therapy program including hypnosis and videotape therapy sessions. In response, the defendant stated that he mistrusted the CSH therapists as a result of their "adversary attitude toward multiple personality disorders and toward Ross Carlson." He asserted that this mistrust was an obstacle to effective psychological treatment and moved the court for an order permitting him to be treated by an outside therapist.

These motions were consolidated for a hearing on April 30, 1985. At the hearing Dr. Barry L. Quinn, a clinical psychologist and hypnotherapist, testified for the defendant. Dr. Quinn had met twice with the defendant in two-hour sessions at the request of the defendant's lawyer[1] and with

1. The defendant apparently sought out Dr. Quinn after learning about him from another

the permission of CSH. Dr. Quinn testified that an adversarial relationship had developed between the defendant and the hospital treatment staff that could damage permanently the prospects for successful treatment of the defendant. Dr. Quinn particularly was concerned that some members of the hospital treatment staff had expressed doubts that the defendant suffers multiple personality disorder. After several meetings between hospital staff and Dr. Quinn, the doctors at CSH decided not to permit Dr. Quinn to treat the defendant. Dr. Quinn believed that he had established a rapport or alliance with the defendant, and the doctor was willing to treat the defendant if permitted to do so by CSH.

At the same hearing, Dr. Robert A. Huffaker, a psychiatrist employed at CSH and the supervisor of the defendant's treatment, testified that a patient's mistrust of doctors is typical of forensic psychiatry where part of the doctor's role is to restore the patient's competency to stand trial. Dr. Huffaker also described the difficulty in treating the psychopathology of a patient suffering multiple personality disorder who avoids confronting his problems. Dr. Huffaker thought that the appointment of an outside therapist would allow the defendant to characterize the outside therapist as good and the hospital staff as bad, thus delaying the fusion of the defendant's multiple personalities and his restoration to competency. In Dr. Huffaker's view, the CSH staff doctors were capable of treating the defendant for multiple personality disorder. Limiting the defendant's options to treatment by the CSH staff, at least for a period of trial therapy, according to Dr. Huffaker could result in the defendant's acceptance of treatment. Therefore, Dr. Huffaker recommended that the court not appoint an outside therapist.

On July 17, 1985, the respondent district court denied the motion to require the defendant to participate in the therapy offered by CSH and granted the defendant's

motion to be treated by an outside therapist. The court found that certain members of the hospital staff had expressed doubts that the defendant suffers multiple personality disorder; that as a result there was a lack of rapport between the defendant and the treatment staff; that under such conditions the defendant could not be restored to competency; and that treatment of the defendant by Dr. Quinn was both necessary and appropriate. The court observed that

> If treatment of [multiple personality disorder] ... requires a one-to-one therapist/patient relationship; requires hypnosis by a treating therapist in whom the patient has confidence; requires trust on the part of the patient; requires conviction on the part of the physician concerning the disorder being treated; requires belief in the diagnosis of multiple personality disorder; then the hospital has no one on its staff who can adequately and appropriately treat the Defendant....
>
> Therefore, if the Defendant will benefit by treatment by Dr. Quinn, then he should be permitted to outline and carry out a treatment program with a hospital team assigned to the Defendant's case....

On August 6, 1985, the defendant filed a motion requesting the district court to order the state to pay Dr. Quinn's fees for treating him. The defendant alleged that he was without sufficient funds to pay for such treatment and that it was the obligation of the state to pay for Dr. Quinn's services. At the hearing on the motions held on August 13, 1985, Bruce Berger, the administrator of the budget for CSH, testified that although CSH regularly contracted with outside doctors for consultation and evaluation, it did not contract for mental health treatment by outside therapists; that the funds available to CSH for contractual services had been allocated; and that there was no provision for transfer-

CSH patient who had been diagnosed by Dr. Quinn as suffering from a multiple personality

disorder.

ring funds designated for another purpose in CSH's budget to contractual services.

At the close of the August 13 hearing the district court decided that the application for payment of Dr. Quinn's fees by the state was premature. The court doubted its authority to order the state to enter into a contract with Dr. Quinn and noted that proceedings were pending in Denver probate court and Arapahoe County district court to determine whether a discretionary trust fund established by the defendant's parents in 1981 would pay Dr. Quinn's fees.

Further hearings on the defendant's motion to compel the state to pay Dr. Quinn's fees were held in September and October of 1985. The district court continued to postpone a decision on the defendant's motion pending resolution of the probate proceedings. On December 10, 1985, the defendant moved again for the state to pay the fees of the outside therapist because Dr. Quinn was not treating the defendant due to the impasse over payment of fees.

On December 27, 1985, the district court granted the defendant's motion to compel the state to pay Dr. Quinn's fees. The court found that CSH was without personnel qualified to provide for the individual treatment needs of the defendant, that the defendant was without funds to pay for such treatment himself, that treatment by Dr. Quinn was necessary to restore the defendant to competency to stand trial, and that the state would not be prejudiced by being required to pay for Dr. Quinn's fees because it could seek reimbursement under Article 12 of Title 27, 11 C.R.S. (1982).[2] Consequently, the district court entered an order providing:

    1. That defendant's Motion to Require the State of Colorado to Pay the Fees of the Outside Therapist, Dr. Barry Quinn, of Colorado Springs, Colorado, is hereby granted.

    2. That the state of Colorado, through the Executive Director of the Department of Institutions, Dr. Frank Traylor, is hereby ordered to seek a supplemental appropriation of its 1985–1986 budget in order to pay for Dr. Quinn's fees for the remainder of this fiscal year.

    3. That the state of Colorado, through the Executive Director of the Department of Institutions, Dr. Frank Traylor, is hereby ordered to include in its annual budget request to the State Legislature such amounts as may be necessary to pay for Dr. Quinn's fees in all subsequent years, as needed.

    4. That in the event the legislature fails to approve an appropriation for either fiscal year 1985–1986 or any other subsequent year, this does not relieve the state of Colorado of its obligation to pay the fees of such therapist.

The superintendent of CSH, the executive director of the department, and the state petitioned this court for relief, arguing that the district court exceeded its jurisdiction in ordering the department to contract with an outside therapist to provide treatment for the defendant and to allocate funds and request an appropriation for paying Dr. Quinn's fees. The petitioners contend that the district court's interference in the department's budgetary affairs violated the principle of separation of powers established by article III of the Colorado Constitution. We need not address the petitioners' separation of powers argument because we conclude that there was no basis in this case for the exercise of the district court's power to ensure adequate

---

**2.** Section 27–12–101, 11 C.R.S. (1982), provides:

    (1) When any person is admitted, committed, or transferred to any public institution of this state supervised by the department of institutions for the care, support, maintenance, education, or treatment of the mentally ill or mentally deficient, such person, his spouse, and his parents shall be liable for the costs of the care, support, maintenance, and treatment of such person to the extent and in the manner provided in this article. No other relatives of such person shall be liable to any extent for such costs.

    (2) The provisions of this article shall apply also to those persons received under the provisions of article 8 of title 16 and sections 16–13–216, 19–8–103, and 19–8–104, C.R.S. 1973, but not by way of exclusion.

treatment for a criminally committed defendant.[3]

## I.

At the outset, we address whether a defendant committed under section 16–8–112, 8 C.R.S. (1978 and 1985 Supp.), as incompetent to stand trial has a right to therapeutic treatment, because in the absence of such a right there would be no basis whatever for the appointment of an outside therapist. The parties, relying on *Marshall v. Kort,* 690 P.2d 219 (Colo.1984), assume the existence of a right to treatment. In *Marshall* we discussed the question but did not need to resolve it. We observed that section 16–8–105(4), 8 C.R.S. (1978) (made applicable by section 16–8–112(2), 8 C.R.S. (1985 Supp.), to commitments on the basis of incompetency) provides that a defendant "shall be held for care and psychiatric treatment." We also noted that the federal district court in *Romero v. Schauer,* 386 F.Supp. 851 (D.Colo.1974), held that section 16–8–105(4) confers on persons criminally committed a right to treatment. *Marshall v. Kort,* 690 P.2d at 223 n. 6.

■ We see no reason to reject the *Romero* court's interpretation of the statute. Construing the criminal commitment provisions to establish a right to treatment is consistent with the statutory language and its purpose of restoring persons criminally committed to competency if possible. Furthermore, a right to treatment for a criminally committed person is consistent with the broad purpose of the civil commitment statutes to "secure for each person who may be mentally ill such care and treatment as will be suited to the needs of the person...." § 27–10–101(1), 11 C.R.S. (1982). Finally, recognition that the involuntarily committed have a statutory right to treatment is in accord with the widely accepted view that the right has a constitutional foundation. *See* cases cited in *Marshall v. Kort,* 690 P.2d at 223.

## II.

■ The defendant's claims of lack of treatment and inadequate treatment, under the proper circumstances, could support the exercise of a district court's supervisory and remedial powers to ensure a criminally committed defendant's right to treatment. In *Parks v. District Court,* 180 Colo. 202, 503 P.2d 1029 (1972), we held that a court that commits a defendant as incompetent to stand trial retains jurisdiction to protect the defendant's constitutional rights. There is no apparent reason why a court should not have the same authority with respect to a defendant's statutory right to treatment. However, before the court's remedial powers properly may be employed, the court must find that the exercise of its authority is necessary to prevent or to correct a violation of the right to treatment. The court here did not make such a finding, and there is no basis in the record before us for a finding that the respondents abridged the defendant's right to treatment.

Although the district court found that the "defendant continues to receive no treatment for his multiple personality disorder," the record reflects that CSH developed and attempted to implement a treatment program for the defendant.[4] The fact that the defendant refused to accept the program offered does not support a determination that the defendant's right to treatment has been abridged. Instead, the appropriate focus for court review is whether the treatment offered by CSH was adequate.

This court has not considered the standard for judicial review of the treatment of mentally ill persons confined to institutions. Other courts, addressing the question, start with the assumption that judges are not well suited to determine appropriate modes of psychiatric treatment. *See*

---

3. By "criminally committed" we refer to those defendants who are found incompetent to proceed. §§ 16–8–110, –111, and –112, 8 C.R.S. (1978 and 1985 Supp.).

4. In October, 1984, after a hearing, and again in November, 1984, the district court found that the hospital had designed and implemented a treatment program.

Bazelon, *Implementing the Right to Treatment*, 36 U.Chi.L.Rev. 742 (1969). Thus, in *Tribby v. Cameron*, 379 F.2d 104 (D.C.Cir.1967), the United States Court of Appeals for the District of Columbia determined that it could review on a petition for habeas corpus an allegation that the petitioner was receiving no treatment in the institution in which he was confined. But the court went on to state that in reviewing the petitioner's claim

> [w]e do not suggest that the court should or can decide what particular treatment this patient requires. The court's function here resembles ours when we review agency action. We do not decide whether the agency has made the best decision, but only make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.

*Id.* at 105.

The same court elaborated on this standard of review in *Williams v. Robinson*, 432 F.2d 637 (D.C.Cir.1970). *Robinson* was a habeas corpus proceeding involving a decision of the administration of a mental hospital to transfer the petitioner to a maximum security unit in the hospital. The court began its analysis with the proposition that "the treatment to be received by each individual patient [is a matter] properly committed to the discretion of the hospital administration." *Id.* at 640 (footnote omitted). The court further stated "[i]n deference to the administrative judgment, judicial review of the merits of internal hospital decisions is strictly limited," and determined that in such cases the obligation of judicial review consisted of ensuring "that the hospital's expertise was actually brought into play." *Id.* at 641; *see also Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv.

L.Rev. 1190, 1342–44 (1974); Bazelon, *supra*, at 745.

Although arising in a different context, *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), is also pertinent to the question at hand. In *Youngberg*, the United States Supreme Court articulated the standard for evaluating whether involuntarily committed mentally retarded persons were receiving "minimally adequate training." The Court stated that

> the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is "reasonable"—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.... For these reasons, the decision, if made by a professional, is presumptively valid....

*Id.* at 322–23, 102 S.Ct. at 2461–62 (footnote omitted).[5]

Under the analysis employed in the cases discussed above, the district court's active involvement in the treatment process was error. Because decisions about the appropriate treatment for the defendant are within the discretion of the CSH staff, the extensive treatment recommendations incorporated in the court's commitment order were unwarranted. The fact that psychia-

---

**5.** The Court noted:

> By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychol-

ogy, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

trists and psychologists may disagree about the effectiveness of the treatment program is irrelevant for purposes of judicial review if the program is a product of the considered judgment of qualified decisionmakers.

Because the district court in this case made no finding that in devising the treatment plan the CSH staff failed to consider the relevant facts and exercise competent professional judgment, there is no basis for a finding that the defendant's right to treatment was denied. In the absence of such a finding there is no ground for judicial interference with the internal functions of CSH represented by the order requiring CSH to permit the defendant to be treated by Dr. Quinn. Consequently there is no foundation for the order concerning the payment of Dr. Quinn's fees.

### III.

Our decision in this case is not affected by the defendant's unwillingness to participate in the treatment program provided by CSH. The court, in granting the defendant's motion to be treated by Dr. Quinn, determined that "[d]efendant will not accept the offered therapy which is his constitutional right" and that "[t]he court cannot order the defendant to accept the proffered treatment," citing *Goedecke v. State Department of Institutions,* 198 Colo. 407, 603 P.2d 123 (1979). However, neither *Goedecke* nor the more recent related case, *People v. Medina,* 705 P.2d 961 (Colo.1985), recognizes a right to refuse all forms of treatment. In those cases we decided only that involuntarily committed persons have

a qualified statutory and common law right to refuse antipsychotic medication with potentially harmful side effects. We did not decide whether and under what circumstances a person in the defendant's position could refuse to submit to other types of therapies.

However, even assuming that the defendant has a right to refuse to participate in the treatment program offered by CSH, and, more realistically, recognizing that any order directing participation in therapy would be of little practical value if the defendant does not wish to cooperate, there is still no basis for deciding that the defendant has the right to be treated by an outside therapist, much less the therapist of his choice. As already determined, the defendant's right to treatment, for purposes of judicial review, consists only of the right to have decisions about the appropriate treatment developed and offered by competent decisionmakers after the exercise of their professional judgment.[6]

The rule is made absolute.

VOLLACK, J., does not participate.

---

**6.** Section 16–8–114.5(2), 8 C.R.S. (1985 Supp.), provides guidance for district court review in cases where a criminally committed defendant refuses to accept treatment:

The court shall review the case of a defendant committed or confined as incompetent to proceed at least every six months with regard to the probability that the defendant will eventually be restored to competency and with regard to the justification for continued commitment or confinement. Such review may be held in conjunction with a restoration hearing under section 16–8–113. Prior to each such review the institution treating the defendant shall provide the court with a re-

port regarding the competency of the defendant. If, on the basis of the available evidence, *not including evidence resulting from a refusal by the defendant to accept treatment,* there is a substantial probability that the defendant will not be restored to competency within the foreseeable future, the court shall terminate the criminal proceeding and the commitment or treatment order under section 16–8–112(2) and shall either order the release of the defendant or the commencement of civil proceedings under the provision of article 10 of title 27, C.R.S.

(emphasis added).