**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Randy D. RIGGS, Defendant–Appellant.**

No. 00CA0398.

Colorado Court of Appeals, Div. IV.

June 20, 2002.

Rehearing Denied July 18, 2002. *

Certiorari Granted April 21, 2003.

* Erickson, J., would grant.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Mark G. Walta, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge NEY.

Defendant, Randy D. Riggs, appeals the trial court's order denying authorization, pursuant to § 16–8–118, C.R.S.2001, for temporary physical removal from state hospital grounds for the purpose of treatment. We reverse and remand for further proceedings.

In 1982, defendant was found not guilty by reason of insanity of first degree murder after he strangled a woman and then sexually assaulted her corpse.

After several attempts, the Colorado Mental Health Institute in Pueblo (CMHIP) gave notice to the committing court that it intended to authorize temporary physical removal of defendant from the hospital for treatment and rehabilitation activities. CMHIP sought permission for supervised leave and, when defendant's doctors thought it was appropriate, for unsupervised leave. The district attorney filed an objection. After an evidentiary hearing, the court denied the request for temporary physical removal in a lengthy written order.

## I.

Defendant contends that the applicable burden of proof should be on the objecting party. We agree.

■ We are not convinced by the People's argument that the burden should always be on the defendant because courts have indicated "it is reasonable to assume that, until the contrary is shown, the committed defendant poses a danger to the public by reason of his mental condition." *People v. Gilliland*, 769 P.2d 477 (Colo.1989)(citing *People v. Chavez*, 629 P.2d 1040 (Colo.1981)).

Here, the issue is not a matter of involuntary commitment as was addressed in *People v. Chavez, supra*, or of involuntary administration of antipsychotic medication as in *People v. Gilliland, supra*. A § 16–8–118 determination is, at its essence, a matter of treatment as opposed to a curtailment of a liberty interest. Furthermore, the plain language of the statute indicates that the court holds a "hearing upon the objections," and thus the burden should rest with the objecting party. *See* § 16–8–118(1)(c).

Thus, we conclude that the burden of proof under § 16–8–118 is on the objecting party, as opposed to the committed defendant. Additionally, the party with the burden of proof must meet that burden by a preponderance of the evidence. *See People v. Garlotte*, 958 P.2d 469 (Colo.App.1997)(applying preponderance of the evidence standard to revocation of defendant's conditional release); *People v. McCoy*, 821 P.2d 873 (Colo.App.1991).

## II.

■ Defendant next contends that § 16–8–118 violates his constitutional rights of due process and equal protection because the statute lacks sufficient procedures and standards. We decline to reach this constitutional argument. Defendant did not adequately preserve it because he raises it for the first time on appeal. *See People v. Boyd*, 30 P.3d 819 (Colo.App.2001).

## III.

■ Defendant next contends that the trial court's order does not reflect that it con-sidered the petition under the correct non-constitutional standards as set forth in prior decisions of Colorado courts. We agree.

Section 16–8–118 authorizes the temporary physical removal of a committed defendant from an institution for treatment and rehabilitation activities. The statute requires that the institution give written notice to the committing court of its intention to allow temporary leave for a committed defendant. Section 16–8–118(1)(a), C.R.S.2001. Thirty days from the date of mailing of the notice, the temporary physical removal request is authorized unless the district attorney or the attorney of record for the defendant files an objection with the committing court. Section 16–8–118(1)(b), C.R.S.2001 (no provision for a hearing if no objection is timely filed).

If an objection is filed, "the committing court shall fix a time for a hearing upon the objections, and no removal of the defendant from the institution in which he is held shall be authorized unless and until approval thereof is given by the committing court following such hearing." Section 16–8–118(1)(c), C.R.S.2001.

■ A request for temporary removal in supervised and unsupervised settings does not implicate the same liberty interests as involuntary commitment or nonconsensual administration of medication. *See People v. Gilliland, supra; People v. Chavez, supra*. However, the request implicates lesser considerations related to safety—both for the community and the committed defendant—than release or conditional release. *See* § 16–8–120, C.R.S.2001 (listing the applicable tests for release of a committed defendant); *People v. Fetty*, 650 P.2d 541, 543 (Colo. 1982)("[t]he state's interest at stake in automatically committing one found not guilty by reason of insanity is to insure the public's safety as well as the safety of the accused himself").

■ Thus, when ruling on a contested request for temporary removal under § 16–8–118, a trial court should assess on the totality of the evidence, whether public safety can be ensured while achieving the therapeutic purpose of the release. *Cf. People v. Gilliland, supra*, 769 P.2d at 480; *Marshall v. Kort*,

690 P.2d 219 (Colo.1984)(recognizing that a committed defendant may have a right to treatment).

■ Additionally, the court should weigh the rehabilitative potential of the temporary removal activities related to the committed defendant's course of treatment against the potential danger to the community based on the defendant's contact with the public. *See People v. Garlotte, supra,* 958 P.2d at 477 ("[i]n formulating release conditions, a court must balance the defendant's best interests with the community's need for safety"). Furthermore, the trial court must give due consideration to the decisions of health care professionals made in the exercise of their professional judgment. *See Kort v. Carlson,* 723 P.2d 143, 150 (Colo.1986)("defendant's right to treatment ... consists ... of the right to have decisions about the appropriate treatment developed and offered by competent decisionmakers after the exercise of their professional judgment"). In giving such consideration, the trial court must indicate and evaluate such decisions in its findings of fact. *See Kort v. Carlson, supra.*

Here, the record indicates that the trial court and the parties adhered to the procedural requirements set forth in § 16–8–118. However, the record does not indicate whether the trial court applied the proper legal standards in ruling on the issue before it. Thus, we remand the case to the trial court to apply the standards we have set forth in this opinion. On remand, the court may also take further evidence if it deems necessary. *See People v. Garlotte, supra.*

Additionally, on remand, defendant should be provided the opportunity to rectify any factual errors that he contends were made by the court in denying his request for temporary physical removal. Finally, with regard to defendant's claim that the trial court improperly admitted letters from the victim's family, we direct that on remand the court consider only evidence relevant under the standards set forth in this opinion.

** Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

Order reversed and case remanded for further proceedings consistent with this opinion.

Judge VOGT concurs.

Justice ERICKSON ** dissents.

Justice ERICKSON dissenting.

I respectfully dissent.

For the first time on appeal defendant asserts violations of the Due Process and Equal Protection Clauses of both the United States and Colorado Constitutions. These constitutional challenges were not raised in the trial court and should not be addressed in this appeal. *See Colgan v. State,* 623 P.2d 871 (Colo.1981).

The majority states that the trial court did not consider the petition under the correct standards and Colorado case law. However, the issue of statutory interpretation is raised for the first time on appeal. Defendant's argument about the procedures set forth in § 16–8–118, C.R.S.2001, was not made in the trial court and is supported only by defendant's appellate brief. Therefore, that argument should not be considered here.

Further, the procedures and burden of proof set forth in the majority opinion expand and materially change the statute enacted by the General Assembly and thus constitute judicial legislation. The procedures to be followed are specified in § 16–8–118. It is not our function to invade the province of the General Assembly with directives that change the burden of proof and the discretion afforded to the trial court in ruling on removal and treatment outside the institution under § 16–8–118.

The prosecution's response to defendant's request for off-grounds privileges and treatment was that there has been an insufficient showing of adequate rehabilitation to warrant his temporary physical removal from the Colorado Mental Health Institute in Pueblo. I agree with the order entered by the trial court, which appears as Appendix A to this dissent.

§ 24–51–1105, C.R.S.2001.

Thus, the trial court was acting within its discretion when it made these findings and entered its order and denied the request for temporary removal for treatment and rehabilitation on a supervised or unsupervised program. Colorado's criminal commitment statutes give the trial court the ultimate responsibility for these decisions relating to commitment and release. *People v. Gilliland,* 769 P.2d 477, 481 (Colo.1989).

Accordingly, I would affirm the order entered by the trial court.

## APPENDIX A

The defendant, Randy Dean Riggs, comes before this Court for authorization for temporary removal from the State hospital for treatment and rehabilitation pursuant to Section 16–8–118, C.R.S. v. 6. This authorization would permit the defendant to leave the premises of the Colorado Mental Health Institute at Pueblo at first in a group under supervision and later, if the treating doctors felt it appropriate and without further Court order, to leave the premises without supervision. The ultimate goal would be to discharge this defendant.

The People filed an objection to such release because the defendant is too dangerous at this time to be permitted these privileges.

1. A jury trial on the issue of sanity was held in [March] 1982 and such jury found that the defendant was not guilty by reason of insanity [of] the crime of murder in the first degree.

2. The evidence has revealed that the defendant in 1981 planned to rape a young school teacher, but gave up that plan and decided to rape a [20–year–old] woman (the victim) and steal her sports car after he had noticed her driving around the Wellington area. He was able to determine where she lived. She had purchased a house in Wellington and was working in nearby Fort Collins driving back and forth in her sports car. The defendant devised a plan earlier as to how he would be able to enter the home of the school teacher and rape her and then decided to use this same plan to gain entry into the victim's home. He went to her door pretending to need to use the telephone. The victim permitted him to enter her home and use the telephone after which he left, but then immediately returned claiming that he had left his wallet inside. The young woman refused to let him back into her home so he forced his way in and attacked her. The victim resisted so he killed her by choking her to death during the violent struggle. After killing the young woman he removed her clothing and had sexual intercourse with her corpse. He then took her automobile and kept it. He later, the next day, came back to the crime scene on at least one occasion and again had sex with the corpse.

3. The defendant, then an independent 16–year–old, had acted out in weird ways at school and elsewhere to get attention. His behavior made most of his teachers and counselors believe the he was not sane. He certainly was different. Although there was expert testimony that the defendant was sane and had merely had a violent criminal personality, there was also expert testimony that he was insane. The jury decided that he was insane and, therefore, not responsible for this crime.

4. The defendant was committed for an indeterminate term at the State hospital for the criminally insane. During the first 12 years all of the doctors determined that the defendant was highly manipulative, had great anger towards everyone, and would explode from time to time when frustrated. He controlled his anger only once during a six-month period. The defendant developed volatile homosexual relationships with some of the other inmates. The defendant would try to manipulate one inmate against another for his own advantage and even manipulate his staff and the doctors.

5. After 12 years the defendant finally admitted to killing the girl and having sex with her after she was dead. Although the defendant admits that he returned to the scene of the crime at least once, he denied he went there for sex. He admitted having sex with the corpse, but states that her body aroused him after he had returned to the crime scene. The doctors (even now) are unable to diagnose a person who has sex with a corpse, or at least [are] unable to diagnose

why this defendant had such sexual relationships.

6. The current testimony reveals that the defendant is now 33 years of age with a borderline personality disorder with antisocial personality disorder, narcissistic traits. Although the defendant has made progress in controlling his great anger, he still is a risk to the community when unsupervised. The doctors are not able to know for sure if the defendant is able to fool them because he knows what they want him to do or if he has actually progressed so that he can be permitted to be in the community. He certainly knows that they want him to do certain things or refrain from doing certain things in order for him to obtain privileges. There will always be a danger to some degree or other and a risk to the community if he is at large. The defendant cannot be cured but there is indication that he may be manageable. The doctors agree that the defendant should not be alone with any young woman and they recognize that the defendant has a great desire to do so. The defendant is lonely. His focus on women is still of concern to the doctors.

7. The defendant acknowledges that his current diagnosis includes sexual disorder, depression, borderline personality disorder with antisocial features, and narcissistic features. The defendant admits that he had relapse signs for dangerous behavior. He states feeling like the world is out to get him and that nobody cares or that people are just pushing him aside. He states that he starts cruising for somebody he can hurt. In the 1980's he had the urge to jump and strangle a female staff member. Besides the great anger problem, he acknowledges that he has sexual problems as well. He wants to have women around him all the time and sometimes to have sex with them. He acknowledges that he had rape fantasies in the past. He reports, "I start thinking about a woman. I get stuck on it. I think this woman wants me ... it goes to where it's sexual." The defendant recognizes that when he reports this to the staff it messes with his privileges. It makes him become dishonest with the staff. "Sometimes I get obsessed to where nothing else really matters and then my thinking gets all haywire." When asked if this was dangerous he replied[,] "It could be."

8. In 1982 when the defendant was first brought to the State hospital, the doctors state that the defendant laughed about the crime he was accused of committing, but refused to acknowledge that he committed it. He would not even look at the pictures of the victim to see what he had done. He now acknowledges what he did and states that [he] is sorry for the victim and her family. The defendant does want to have these [additional] privileges.

9. The defendant relatively recently upset one of his female therapists when he glared at her for a period of time in [July] 1999. This was a very hostile, angry action on his part.

10. Although the treating doctors have become friends of the defendant, want to recognize success of their treatment programs for him, and may want him to have progressed to the point that he can have unsupervised trips away from the hospital, this Court finds that the risk is far too great at least at this time to permit him to be unsupervised away from the hospital. The treatment has not yet reduced the defendant's problems with anger and his sexual desire for women to allow him to advance to this next level.

Therefore, the Court denies the defendant's request for permission to have temporary removal for treatment and rehabilitation away from the hospital in supervised or unsupervised releases.