The PEOPLE of the State of Colorado, Petitioner

v.

Randy Dean RIGGS, Respondent.

No. 02SC543.

Supreme Court of Colorado, En Banc.

March 8, 2004.

Rehearing Denied April 5, 2004.*

---

* Justice MARTINEZ and Justice BENDER would grant the Petition.

Ken Salazar, Attorney General, John T. Bryan, Assistant Attorney General, Criminal Justice Section, Appellate Division, Denver, Colorado, Attorney for Petitioner.

David S. Kaplan, State Public Defender, Mark G. Walta, Deputy State Public Defender, Denver, Colorado, Attorney for Respondent.

Justice COATS delivered the Opinion of the Court.

The People sought review of the court of appeals' judgment in *People v. Riggs*, 68 P.3d 478 (Colo.App.2002), concerning the temporary removal of an insanity acquittee from the state hospital. The court of appeals reversed the district court's order rejecting the hospital staff's recommendation to permit the temporary removal of Randy Riggs from confinement for treatment and rehabilitation. In the absence of any express articulation of standards in the removal statute, the court of appeals held that the district court should have weighed the rehabilitative potential of removal against the potential danger to the community, giving due consideration to the decisions of the health care professionals, and it should have approved the recommendation unless the district attorney proved by a preponderance of the evidence that removal was unwarranted. Because the court of appeals erred in imposing this burden of

proof on what is a matter of discretion for the district court, we reverse.

## I.

In April 1981, the respondent, Randy D. Riggs strangled a woman and had sexual intercourse with her dead body. The following day he returned to her home and again had relations with her corpse. Riggs, then sixteen years old, was charged with first-degree murder. In 1982, a jury found him not guilty by reason of insanity, and he was committed to the Colorado Mental Health Institute in Pueblo (CMHIP), where he has remained ever since.

From 1990 through 1996, CMHIP gave notice on six different occasions that it intended to authorize temporary removal of Riggs for treatment and rehabilitation. On each occasion, the request for the approval of the district court was either denied or withdrawn by CMHIP. In June 1999, CMHIP again gave notice of its intent to authorize temporary physical removal of Riggs from the hospital for treatment and rehabilitative activities. It sought permission for Riggs to leave the premises in a supervised group and later, when Riggs' doctors thought it was appropriate and without further court order, for unsupervised leave.[1] The ultimate goal of the treatment was the discharge of Riggs from CMHIP.

The district attorney filed an objection, as permitted by statute, and the court heard the objection[2]. At the hearing, two of Riggs' treating physicians testified and offered supporting documentation for their medical and professional judgments that Riggs had reached a point in his treatment at which his continuing progress hinged on his transition into off-grounds supervised treatment. They testified that while Riggs would likely retain residual aspects of his antisocial personality disorder, they did not believe that he would pose a danger to himself or others.[3]

Apart from the testimony of the physicians, the hearing consisted of cross-examination by the district attorney; production of letters from the victim's family; and an opportunity for Riggs to address the court and offer a report on his family therapy, a GED and various certificates of completion, and letters of recommendation. The district court took the matter under advisement.

In a lengthy written order, the district court denied the request for temporary removal. After recounting the events leading to the defendant's plea of not guilty by reason of insanity and his subsequent automatic commitment, as well as the history of his behavior and evaluations while confined from that time until the hearing, the district court found that the risk was far too great to permit Riggs to be away from the hospital unsupervised. The district court discounted the assurances and predictions of the hospital staff, in part because of their long-time association with Riggs and because of what it considered to be their desire to recognize the success of their treatment programs for him. Instead it chose to emphasize their agreement that he should not be left alone with any young women, despite his great desire to do so; his diagnosis, including sexual disorder with antisocial and narcissistic features; and the doctors' inability to know for sure if he was able to fool them.

Riggs appealed the district court's refusal to give its approval, and with one member of the panel dissenting, the court of appeals reversed. A majority of the court construed the statutory provisions for temporary removal[4] to impose, implicitly, a burden on any

---

1. One of the treating physicians for CMHIP testified that supervised off-grounds privileges allow the patient to leave the grounds to participate in recreational and treatment activities under the supervision of hospital staff and are subject to immediate revocation or suspension. Unsupervised off-grounds privileges may be granted after six months to five years of supervised off-grounds activity.

2. See § 16–8–118(1)(b), 6 C.R.S. (2002).

3. The chief officer of CMHIP was presumably, however, unable to determine that Riggs no longer "suffered from a mental disease or defect which (was) likely to cause him to be dangerous to himself, to others, or to the community in the reasonably foreseeable future," a determination that he would have been obliged to report to the court, statutorily precipitating a hearing on Riggs' discharge. See § 16–8–116.

4. § 16–8–118, 6 C.R.S. (2002).

party objecting to authorization for temporary removal to prove, by a preponderance of the evidence, that such removal was unwarranted. In addition to failing to reflect any recognition of this burden, the district court's order was also held deficient for failing to reflect a proper determination whether public safety could be ensured while achieving the therapeutic purpose of the release, and to weigh the rehabilitative potential of the temporary removal activities against the potential danger to the community based on the defendant's contact with the public, giving due consideration to the decisions of the health care professionals made in the exercise of their professional judgment. The court of appeals ordered the district court to consider on remand only evidence relevant to these considerations.

The district attorney petitioned this court for a writ of certiorari.

## II.

■ A defendant who is acquitted of a crime by successfully asserting the defense of insanity must be committed to the custody of the Department of Human Services until he is found eligible for release. § 16–8–105(4), 6 C.R.S. (2002). The public safety is clearly identified as the governmental interest supporting this automatic commitment of criminal insanity acquittees. *People v. Chavez,* 629 P.2d 1040, 1052 (Colo.1981). The state has a legitimate interest in protecting the public from those who have previously engaged in overt criminal conduct but have been relieved of criminal responsibility by reason of legal insanity. *Id.; see People v. Logan,* 196 Colo. 573, 588 P.2d 870 (1979); *People v. Howell,* 196 Colo. 408, 586 P.2d 27 (1978).

■ The assertion of the insanity defense and the judicial determination implicit in the insanity adjudication—that the accused engaged in criminal conduct as a result of mental disease or a questionable state of legal sanity—place the legally insane defendant in a special class of persons posing an imminent danger to public safety were they to be immediately released from detention. *Chavez,* 629 P.2d at 1053. An insanity adjudication therefore results in a presumptive

continuation of a state of mental incapacity, and corresponding danger to the public, until it is shown that sanity has been restored. *Id.* at 1048. According to the sanity provisions applicable at the time of Riggs' conduct, an insanity acquittee becomes eligible for release only when he no longer has a mental condition likely to cause him to be dangerous to himself or others, or to the community, in the reasonably foreseeable future. § 16–8–120(1).

■ Largely because of this presumptive continuation of a state of mental incapacity and danger to the public, imposing a burden on insanity acquittees to prove their eligibility for release has been upheld as justified under certain circumstances. *See Chavez,* 629 P.2d at 1050. Currently, the statutory scheme requires the acquittee to prove his restoration to sanity by a preponderance of the evidence, once any evidence of his insanity is introduced. § 16–8–115(2). In contrast to a person who has been civilly committed, a defendant adjudicated criminally insane has demonstrated by his conduct, as in this case, a likely illness and corresponding danger more threatening to the safety of others. *Chavez,* 629 P.2d at 1054. The more stringent standards of release applicable to the criminally committed defendant reflect the increased risk to the public associated with the release decision and, as in the case of automatic commitment, those release standards are reasonably related to the state's interest in public safety. *Id.; e.g., United States v. Ecker,* 543 F.2d 178 (D.C.Cir.1976), cert. denied, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *Logan,* 196 Colo. 573, 588 P.2d 870 (1979); *Howell,* 196 Colo. 408, 586 P.2d 27 (1978); *State v. Alto,* 589 P.2d 402 (Alaska 1979); *In re Lewis,* 403 A.2d 1115 (Del.1979).

■ Even after a finding, whether by court or jury, that the acquittee has been restored to sanity (under the appropriate statutory standard) and therefore must be released, the general assembly accounts for the state's continued interest in public safety by granting to the committing court the discretion to impose conditions on the released acquittee. *See* § 16–8–115(3)(a). The deci-

sion whether to impose terms and conditions, and precisely which terms and conditions to impose, is solely for the court. *People v. Giles,* 192 Colo. 240, 247, 557 P.2d 408, 413 (1976). Without any specific showing or burden of proof, the statutory scheme grants the discretion to impose such terms and conditions as the court determines are in the best interests of the acquittee and the community. § 16–8–115(3)(a). And although those conditions cannot be punitive in nature, like criminal probationary conditions that are unrelated to the individual seeking release, *see Campbell v. Dist. Court,* 195 Colo. 304, 577 P.2d 1096 (1978), it is clearly proper to require an insanity acquittee to accept outpatient care or supervision. *See Scheidt v. Meredith,* 307 F.Supp. 63 (D.Colo.1970). A defendant who has been conditionally released remains, by statute, under the supervision of the Department of Human Services, subject to revocation and recommitment until the court orders his unconditional release. § 16–8–115(3)(b).

There is yet another circumstance in which the statutory scheme permits an insanity acquittee to leave the institution in which he has been confined. Despite not yet having established his eligibility for release, an insanity acquittee may nevertheless be temporarily removed from confinement for treatment and rehabilitation. § 16–8–118. In sharp contrast to the statutory provisions for release, *see* § 16–8–115(2), and for revocation of conditional release, *see* § 16–8–115.5(8), which specify legal standards and expressly allocate burdens of proof, the temporary removal provision merely requires an authorization by the chief officer of the institution that either draws no objection or has the approval of the court. § 16–8–118(1)(c).

■ Whenever his physicians propose to treat an acquittee outside the facility to which he has been confined, the statute requires written notice, by certified mail, to the court and the district attorney, at least 30 days before removal may be authorized. Although the statute permits such treatment without formal court approval when no objection is raised, upon objection of any kind the matter must be heard, and authorization for the acquittee's removal may not be granted without the court's approval. § 16–8–118(1)(a),(b),(c). From these provisions, the court of appeals found an intent on the part of the legislature, despite its expressed concern for public safety, to authorize removal of the acquittee into the community, without supervision when the doctors so prescribe, unless the original prosecuting officer can prove by a preponderance of the evidence that the risk of continued dangerousness is too great to be offset by the medical benefits of the treatment plan.

Procedurally, this juxtaposition of the burden, which is expressly imposed by the general assembly on insanity acquittees to justify their "release" by proving their restoration to sanity, flows (by this reasoning) from the statute's allowance of authorization by the chief officer of the institution, in the absence of any objection, and from the statute's requirement that there be a hearing "upon the objections," in the event there are any. Rather than merely eliminating the need for a formal court ruling where no interested party proposes to challenge the hospital's recommendation anyway, the scheme is understood by the court of appeals as transforming the objecting party into the movant, or petitioner, upon whom it then imposes the traditional burden of going forward with sufficient evidence to justify his motion or request. In this view, by permitting the hospital to act without formal court approval when nobody objects, the legislature intends to convert the objection to the hospital's recommendation into the motion at issue. Eliminating the need for judicial approval unless there is some objection, however, does not alter the fact that the acquittee, or the doctor on the acquittee's behalf, is still the party seeking to change the status quo of confinement, which is mandated by the continuing presumption of his dangerousness, nor is there anything to suggest any awareness by the legislature that by eliminating a needless proceeding, it might be shifting a burden to the state to justify continued confinement.

Similarly, the suggestion that unsupervised "removal" from confinement is a treatment decision, better left to doctors, and does not involve the same risk of danger to the public

as "release," ignores practical realities. While "release" following an acquittee's restoration to sanity permits the imposition of terms and conditions designed to insure continuation of the acquittee's restored mental health, "removal" leaves the extent of the acquittee's supervision, if any, entirely to medical personnel. And while greater process may be required to revoke a "conditional release" than to return an acquittee from "removal for treatment or rehabilitation," a great deal of unsupervised time is not needed to commit the type of crimes already admitted by this acquittee. No matter how summary or abbreviated the process for return to confinement, the harm inflicted on the public during those unsupervised weeks, days, or hours cannot be undone. While the psychological benefits of unsupervised commingling with the community may be a medical decision, protection of the public is not. *See United States v. Hinckley,* 292 F.Supp.2d 125, 147 (D.D.C.2003) (citing *United States v. Ecker,* 543 F.2d at 190 for the proposition that unlike treatment, dangerousness is a question for the courts).

In light of the legislature's creation of a statutory scheme designed to protect the public safety by requiring automatic commitment of insanity acquittees; by conditioning release upon their ability to overcome the presumptive continuation of their mental incapacity; and by subjecting them even then to court-imposed release conditions, it is simply unrealistic to read into the requirement for court "approval," of any objected-to removal recommendation, a legislative intent that such approval must be granted unless the state can demonstrate that removal would be unwarranted. By the same token, however, neither does the statute suggest the imposition of any particular burden on acquittees to prove justification for removal.

Quite the contrary, by conditioning removal for rehabilitation, at least whenever there is not complete agreement about its propriety, on the "approval" of the court, the statutory language strongly implies that the decision is a matter of court discretion. The term "approval" itself implies knowledge and the exercise of discretion after knowledge. Black's Law Dictionary 102 (6th ed.1990) (cit-

ing *McCarten v. Sanderson,* 111 Mont. 407, 109 P.2d 1108, 1112 (1941)). It is generally held that requiring the approval of a distinct officer to validate the act of another, evidences a legislative intent that such officer be vested with the discretion to officially sanction or disapprove that act. *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559, 561 (S.D.1981) (citing *Gustafson v. Wethersfield Tp. High School Dist. 191,* 319 Ill.App. 255, 49 N.E.2d 311, 313 (1943)). The very act of 'approval' imports the act of passing judgment, the use of discretion, and the determination as a deduction therefrom unless limited by the context of the statute. *Melton v. Cherokee Oil Gas Co.,* 67 Okla. 247, 170 P. 691, 697 (1917).

In its abstract sense, judicial discretion implies the absence of any settled legal standard that controls the controversy at hand. *Buckmiller v. Safeway Stores, Inc.,* 727 P.2d 1112, 1115 (Colo.1986). Judicial discretion therefore means that the court is not bound to decide the issue one way or another, but has the power to choose between two or more courses of action and is not bound in all cases to choose one over the other. *Id.; People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987), *see also* R. Aldisert, The Judicial Process 704, 706 (2d ed.1996). Because there is no single correct answer, under any given set of facts, the outcome is never predetermined by the failure of either party to shoulder a burden of persuasion, and review of the court's decision is limited to an inquiry into whether the court abused its discretion in making the choice that it did. Discretionary decisions will not be disturbed unless the court's action was manifestly arbitrary, unreasonable, or unfair. *Milton,* 732 P.2d at 1207.

While the temporary removal provisions may not specify particular factors upon which the court's approval should be based, the entire statutory scheme of automatic commitment and conditional release leaves no doubt that the court's overriding concern in dealing with the release of insanity acquittees must be one of public safety. Permitting the removal of an insanity acquittee from confinement without proper supervision, before he is able to satisfy the statutory prerequisites for

release, arguably poses an even greater threat to public safety than release without adequate terms and conditions to prevent relapse. Although an insanity acquittee has a limited right to treatment, *see Kort v. Carlson,* 723 P.2d 143 (Colo.1986), he has no right to treatment outside the institution in which he has been placed, except with the approval of the court. Because the court is not itself granted the authority to impose conditions on such treatment, it must therefore satisfy itself that any proposal for removal for treatment and rehabilitation will be consistent with the safety of both the public and the acquittee, before granting its approval.

While Colorado's precise formula for "removal" of an insanity acquittee appears to be unique, several other jurisdictions with similar provisions for furlough or removal to less restrictive confinement have arrived at similar conclusions about the discretionary role of the courts. *See, e.g., State v. Morris,* 2 Neb. App. 887, 518 N.W.2d 664, 671 (1994) (where insanity acquittee seeks greater freedom while institutionalized, neither State nor acquittee has burden of proof, and court's discretionary decision will not be disturbed in absence of abuse of discretion); *State v. Johnson,* 32 Ohio St.3d 109, 512 N.E.2d 652, 655–56 (1987) (since acquittee is not being discharged from commitment and statute does not specifically require otherwise, no party bears burden of proof as to transfer of acquittee to less restrictive setting, a matter instead committed to sound discretion of court);[5] *cf. People v. Cross,* 289 Ill.App.3d 876, 225 Ill.Dec. 660, 684 N.E.2d 135 (1997) (where recommendation of pass privileges constituted modification of acquittee's treatment plan rather than transfer to non-secure setting, discharge, or conditional release, burden of proof actually rested on acquittee).

■ It has long been noted that " '[p]roceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings' . . . Thus technical rules as to who has the burden of bringing relevant evidence to the attention of the court do not apply." *United States v. Ecker,* 543 F.2d 178, 192 (U.S.App.D.C.1977) (quoting Judge Bazelon from *Bolton v. Harris,* 395 F.2d 642, 653 (D.C.Cir.1968), in turn quoting from *Lake v. Cameron,* 364 F.2d 657, 661 (D.C.Cir.1966)(en banc)); *see also People v. Dist. Court,* 192 Colo. 225, 557 P.2d 414, (1976) (The nature of the proceeding into an inquiry into the mental condition of a defendant who has been committed under a plea of not guilty by reason of insanity, is not an adversary proceeding in the usual sense of a case which is controlled by the rules of civil procedure.). Especially where approval for a hospital-initiated treatment plan is at issue, proceedings have been held to be "truly investigatory," with "the district court, the hospital, the patient, and the government sharing an obligation to elucidate and explore all the relevant facts." *See Ecker,* 543 F.2d at 193; *see also State v. Johnson,* 512 N.E.2d at 653 (rather than any burden of proof, parties have duty to present relevant, competent evidence to aid the court). And while it may not be illogical for the hospital, as the proponent of the treatment plan, to go forward with evidence supporting its recommendation, matters concerning the order of evidence are extremely discretionary and do not imply any particular burden of proof. *See Ecker,* 543 F.2d at 193–94.

Under Colorado's statutory scheme, only the institution charged with custody of an acquittee may authorize his removal for treatment or rehabilitation. Because such removal can be authorized only with the agreement of the district attorney and the attorney of record for the defendant, or with the approval of the court, the institution, the district attorney, the acquittee, and the court are all necessarily concerned in the decision, which involves both the interests of the acquittee and the interests of the community. In the absence of any more express statement by the general assembly limiting the "approval" of the court, it must be considered, as the word implies, a matter of discretion, in which the parties, respectively,

---

**5.** *But see State v. Mahaffey,* 140 Ohio App.3d 396, 747 N.E.2d 872 (2000) (noting change in statute after *Johnson* ).

"share an obligation to elucidate and explore all the relevant facts." *Id.*

## III.

Nothing in the record suggests arbitrariness or unreasonableness in either the way the proceedings were conducted or the manner in which the court exercised its discretion. The defendant went forward by agreement, and all parties were permitted to present their positions. The court refused to give its approval to the plan specifically because it could have permitted the insanity acquittee to leave the confines of the institution without supervision, at the sole discretion of his physicians and without any showing of restoration to sanity or any further approval by the court. The district court expressly declined to approve unsupervised removal from confinement because of the risk it found to the public and especially women, based on its review of the defendant's criminal acts as well as his behavior while in confinement.

The court did not abuse its discretion in emphasizing the uncertainties involved in predicting the insanity acquittee's future behavior and the seriousness of his misconduct in the past, rather than sharing the confidence of his doctors in his lack of dangerousness. The chief officer of the institution clearly failed to make any determination that Riggs no longer required hospitalization because he no longer suffered from an abnormal mental condition that was likely to make him dangerous, because such a determination would have necessarily precipitated a discharge hearing. *See* § 16–8–116. Similarly, there is no indication in the record that the hospital offered to modify the treatment plan to alleviate the court's concerns. The court merely exercised its discretion to deny the plan because it allowed for the removal of an unrestored insanity acquittee, who admitted committing the most serious of crimes, without supervision of any kind.

## IV.

The judgment of the court of appeals is therefore reversed, and the matter is re-manded for further proceedings consistent with this opinion.

Justice MARTINEZ dissents and Justice BENDER joins in the dissent.

Justice MARTINEZ dissenting:

We granted certiorari in this case to address the following issue:

Whether the court of appeals erred in concluding that the objecting party, and not a criminal defendant found not guilty by reason of insanity, has the burden of proof in a hearing to determine whether a defendant is eligible for temporary release from the state hospital for treatment and rehabilitation activities.

The majority opinion neither resolves the question presented, nor provides any guidance to the parties and courts involved in hearings on temporary removal of a patient from an institution for treatment and rehabilitation. Because I find that the majority's interpretation of the statute is not functional, and because I do not believe the legislature intended such a result, I respectfully dissent. I would find that the burden of going forward and the burden of proof properly fall on the objecting party, not only because such an outcome comports with the statutory structure, but also because it is consistent with our previous decisions regarding the placement of burden. Therefore, because I agree with the court of appeals, I would affirm and remand for further proceedings.

I begin my discussion with a brief outline of the statute around which the dispute in this case is centered: section 16–8–118, 6 C.R.S. (2003), which governs temporary removal of a patient from an institution for treatment and rehabilitation. This section grants authority to the chief officer of the institute in which a patient has been committed to allow temporary removal of the patient for treatment and rehabilitation activities. § 16–8–118(1)(a). The statute requires that the chief officer notify both the committing court and the district attorney that he will authorize temporary removal for treatment and rehabilitation activities unless he receives written objection from either the district attorney or the patient. *Id.* Thus, ab-

sent objection by either the patient or the district attorney, authorization for removal proceeds at the discretion of the chief officer. *Id.* Only when the district attorney or the patient objects to the temporary removal does the committing court become involved; at that point the court is required to hold a hearing "upon the objections." § 16–8–118(1)(c). Removal is then conditioned on the court's approval following the hearing. *Id.*

As resolution of this case depends on the proper interpretation of this statute, I reiterate the rules of statutory interpretation that this court has laid out in innumerable cases before. When construing a statute, we seek to interpret it so that we give effect to the legislature's intent. *Lagae v. Lackner,* 996 P.2d 1281, 1284 (Colo.2000). We presume that the legislature intended a just and reasonable result. *Id.* Thus, we should consider the legislature's intent and the purpose behind the statute rather than adopting a "literalist interpretation that leads to an absurd result." *Id.*

Section 16–8–118(1) vests authority in the chief officer of the hospital to allow temporary removal of a patient for treatment and rehabilitation. Originally, the statute gave this power to the committing court upon the written request of the executive director of the department of institutions. Ch. 44, § 39–8–118, 1972 Colo. Sess. Laws 225, 232. However, the General Assembly amended that section in 1973 and transferred to the chief officer of the institution the power to authorize the temporary removal of his patients, absent objection. Ch. 144, sec. 1, § 39–8–118, 1973 Colo. Sess. Laws 501.

By granting authority to the chief officer, the General Assembly clearly presumed that the chief officer can appropriately weigh the various factors that go into a decision to allow temporary removal, including the patient's continued progress in his treatment and the risk to public safety. Thus, in all of the cases where the chief officer's decision is not challenged, the legislature has left the decision regarding temporary removal in the sole hands of the chief officer of the institution. § 16–8–118(1). This allocation of authority is also consistent with our previous decisions in which we stated that treatment decisions are best left in the hands of those providing treatment. *People v. Gilliland,* 769 P.2d 477, 483 (Colo.1989); *Kort v. Carlson,* 723 P.2d 143, 149 (Colo.1986).

From a practical perspective, when there is an objection, the authority to make this decision must shift because the chief officer of a hospital cannot hold a hearing, weigh evidence, and hear arguments. Thus, the authority to make this decision likely shifts not because the legislature no longer trusted the chief officer to make this decision, but because a court is better suited to hear and consider arguments from opposing sides.

Nonetheless, once an objection is made and a hearing scheduled, the first issue to arise is who must shoulder the burden of going forward. The statute does not explicitly state who has this burden. It states only that the court must hold a hearing "upon the objections." § 16–8–118(1)(c). As the hearing is *"upon* the objections," and the objecting party presumably has information revealing why the chief officer's decision to allow temporary removal is flawed, the burden of going forward naturally should fall to the objecting party to present that evidence. Similarly, the objecting party is also better situated to assume the burden of proof.

The majority opinion states that the court has discretion to approve removal decisions and that the imposition of a burden is inconsistent with that discretion. The majority decision is not useful to the parties and courts involved in removal hearings. In every case where an objection is made, the court must hold a hearing. Under the majority opinion, the court will have to determine, in each case, which party will go forward. As a practical matter, the court will likely impose that burden on the objector as the objector possesses evidence which demonstrates why the chief officer's decision was inappropriate. The court cannot impose the burden on the institution, which is not a party to the action. Similarly, it does not make sense to impose the burden on the party supporting the chief officer's recommendation, if in fact one of the parties does support the recommendation, because that party will merely reiterate the reasons behind the chief officer's decision. Only by

placing the burden on the objector will the court be able to address the issues raised in the objection as required by the statute: the hearing must be held "upon the objections." By refusing to impose a burden, the majority merely dodges the issue raised and arrives at a result that is impractical and may lead to confusion at scheduled hearings.

Furthermore, both the burden of going forward and the burden of proof generally rest on the moving party. "The test for determining which party has the affirmative, and therefore the burden of establishing a case, is found in the result of an inquiry as to which party would be successful if no evidence at all were given, the burden being of course on the adverse party." *American Ins. Co. v. Naylor*, 101 Colo. 34, 39, 70 P.2d 349, 352 (1937). Under this test, the burden in this case clearly must fall upon the objecting party; if that party did not present evidence in support of its objection, the chief officer's decision should prevail because that decision would stand had no objection been made.

I agree with the majority that public safety is an important concern both in cases of removal and release. Nonetheless, I do not agree that the General Assembly intended for the committing court to have complete discretion as to removal decisions merely upon the unsupported objection of a party.

Although the majority cites to other states for support, my review of statutes in other states was not particularly helpful. Dictated by very different statutory mandates, other state courts have made varying decisions about where the burden in a change of confinement hearing should be placed. Although other state cases may appear to lend support for the majority's opinion, upon closer examination, they illustrate only that courts are bound to interpret statutes consistent with legislative intent.

The Nebraska legislature, for example, has vested great authority in its courts to make rather involved decisions about a patient's treatment. *See* Neb.Rev.Stat. § 29–3702(2) (West 2004). Under the Nebraska scheme, upon a finding of dangerousness, the court orders the defendant to a treatment program. *Id.* Additionally, the court dictates the conditions of liberty and monitoring. *Id.* Personnel at the treatment facility must obey the court ordered conditions or face "the full contempt powers of the court." *Id.* Clearly, the statutory scheme gives the court the power to make decisions regarding the defendant's treatment and confinement.

Consequently, when faced with the question of whether the state was required to present clear and convincing evidence that the defendant remained dangerous in review hearings regarding conditions of confinement, the Nebraska Court of Appeals held that the court had discretion. *State v. Morris*, 2 Neb.App. 887, 518 N.W.2d 664, 668–69 (1994). The court stated that the statute did not specify a burden of proof regarding conditions of confinement but "clearly imposes on the court the burden to determine what freedom of movement outside the locked facility is consistent with the safety of the public." *Id.* at 669. Thus, the court held that neither the State nor the defendant had the burden of proof to demonstrate whether a change in freedom of movement is warranted. *Id.* at 671. Rather, decisions regarding conditions of confinement were vested in the discretion of the trial court, consistent with the legislature's grant of authority to the courts. *Id.* Therefore, although Nebraska adopted the same holding as the majority proffers today, the Nebraska court did so under a dramatically different statutory scheme than Colorado's.

An Ohio case provides another example of a situation where temporary removal decisions were left to the trial court's discretion. *See State v. Johnson*, 32 Ohio St.3d 109, 512 N.E.2d 652 (1987). Again, however, the statutory scheme that was in place at the time of that decision granted the courts significant authority. At the time of *Johnson*, the Ohio statute regarding changes in confinement conditions required a hearing in all cases and required the trial court to approve all changes in confinement. Ohio Rev.Code Ann. § 2945.40 (West 1995). Therefore, the court in *Johnson* appropriately left discretion in the trial court. The statute was later superceded, however, as the legislature clearly felt that the burden should properly fall on the prosecutor to show, by clear and convinc-

ing evidence, why a patient should not be allowed greater freedoms. *See* 1996 Ohio Laws 258; Ohio Rev.Code Ann. § 2945.401 (West 2004); *State v. Mahaffey*, 140 Ohio App.3d 396, 747 N.E.2d 872, 875 (2000). Thus, although the original statute allowed room for the trial court's discretion, the legislature later decided that the burden should properly fall on the prosecutor.

Our statutory scheme is consistent with our previous pronouncements about the relationship between institutions and the courts. Temporary removal is a treatment mechanism. Just as it is the court's business to resolve disputes, it is for the patient's doctors, who report to the chief officer, to decide the best course of treatment for a patient. *See Gilliland*, 769 P.2d at 483; *Kort*, 723 P.2d at 149. Although removal implicates some of the same concerns as release in that a defendant participates in activities outside of the hospital, temporary removal for treatment activities is a far less drastic step than release from the institution altogether.

The majority incorrectly lumps the removal and release provisions into one. However, the statutory framework for temporary removal stands in stark contrast to the procedures required for conditional or unconditional release from confinement. § 16–8–115, 6 C.R.S. (2003). In a case of release, the court must always hold a hearing. *Id.* If any evidence of insanity is introduced, the statute specifically states that the defendant bears the burden of proving, by a preponderance of the evidence, restoration of sanity. § 16–8–115(2)(a). The test for restoration of sanity for release is a dangerousness determination which requires that "the defendant has no abnormal mental condition which would be likely to cause him to be dangerous either to himself or to others or to the community in the reasonably foreseeable future." § 16–8–120(1), 6 C.R.S. (2003).[1] The court, or a jury when requested, then determines whether the defendant is eligible for release. § 16–8–115(3)(a).

Although issues of public safety exist for the removal program, an exaggerated focus

on these concerns disregards the legislative intent to permit treatment outside of the institution even though a patient may still suffer from "an abnormal mental condition" and thus be ineligible for release. The heightened scrutiny by the court in cases of release, as compared to removal, makes sense when one considers the purposes behind the two sections. When a patient is being released from an institution, the court must insure that the patient is adequately rehabilitated and able to reintegrate into society. Temporary removal, on the other hand, is authorized when treatment within the confines of the institution is no longer helping the patient. Thus, according to doctors at the treating institution, temporary removal allows treatment outside the institution as a step toward rehabilitation and the ultimate goal of release. In this way, committed patients do not go from institutional confinement to release without any measures to insure that they can reintegrate into the outside world.

Furthermore, an exaggerated focus on public safety ignores the practical realities of both the patient's present confinement and the temporary removal program. First, granting temporary removal privileges to Riggs would not present as great of a step from the patient's present confinement as the majority implies. The doctors at the hospital testified that Riggs has already had unsupervised on-grounds privileges for more than four of the last six years. Riggs has never attempted to escape even though the grounds are not locked and a major street separates two parts of the campus. Consequently, temporary removal off the hospital grounds does not present a large step from the patient's present situation. Second, the temporary removal program is a controlled and gradual program to reintroduce patients into society. Doctors from the hospital testified that when temporary removal is granted, the program begins with supervised recreational and treatment activities. The patient continues to live and undergo treatment at the institution in which he is committed. Unsu-

---

1. The statute outlines different tests depending on the date of the offense. This test applies to crimes committed on or after June 2, 1965, but before July 1, 1983. The offense in this case was committed in 1981.

**120**

pervised temporary removal generally does not occur until the patient has responsibly exercised supervised removal for a period of six months to five years. Furthermore, both supervised and unsupervised removal privileges are subject to suspension or revocation. Thus, the temporary removal program provides the next step for patients like Riggs who have already demonstrated their ability to responsibly handle on-grounds privileges. It allows the hospital to maintain supervision and treatment while still providing the next step for patients to progress in their rehabilitation.

The General Assembly has differentiated between release and removal and has clearly given the institution in which the patient is committed more discretion in removal decisions. Thus, the General Assembly has trusted in the chief officer, and by extension the institution's doctors, to make appropriate decisions in removal cases in which there are no objections to removal. We must respect that trust. The General Assembly has stated that the committing court should hold a hearing only when there is an objection, and upon that objection. Therefore, it appears to me that the General Assembly intended for the objecting party to shoulder the burden to demonstrate why the chief officer's decision was incorrect.

Accordingly, I respectfully dissent. I would affirm the decision of the court of appeals.

I am authorized to say that Justice BENDER joins in this dissent.

